Merle SCHUNEMAN and Robert Doty, Trustees under Trust Agreement dated April 10, 1977, with Kathryn M. Keefe, as Settlor, Plaintiffs-Appellants,

v.

UNITED STATES of America, Defendant-Appellee.

Nos. 84–2651, 84–2888.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 10, 1985.
Decided Feb. 10, 1986.

B. Douglas Stephens, Jr., Van Derkamp, Cleaver & Stojan, P.C., Rock Island, Ill., for plaintiffs-appellants.

Michael J. Paup, Chief Appellate Section, Asst. Atty. Gen., Tax Div., U.S. Dept. of Justice, Washington, D.C., for defendant-appellee.

Before WOOD and ESCHBACH, Circuit Judges, and SWYGERT, Senior Circuit Judge.

ESCHBACH, Circuit Judge.

Merle Schuneman and Robert Doty ("taxpayers"), as trustees of a trust established by Kathryn Keefe, appeal from the district court's order, 570 F.Supp. 1327, denying special use valuation under 26 U.S.C. (I.R.C.) § 2032A of approximately 330 acres of farmland. The government cross-appeals from an order requiring it to refund approximately $8,000 of interest that taxpayers paid as a result of the initial disallowance of a state death tax credit. We will reverse and remand in the appeal, and vacate the district court's order and remand for a recalculation of the refund in the cross-appeal. We hold that taxpayers are entitled to special use valuation under I.R.C. § 2032A because the income derived from the lease of the farmland was substantially dependent upon production.[1]

I

The farmland in question, which is located in Whiteside County, Illinois, has been owned by the Keefe family since 1895. Kathryn Keefe lived on the farm her entire life, from her birth in 1897 until her death in 1977. The farm was operated by Kathryn's parents, and, following their deaths, by Kathryn and her brothers Jerold, Cecil and Harry. Jerold and Cecil predeceased Kathryn in 1956 and 1961 respectively, and she inherited their shares. She also acquired 40 acres from another party, bringing her total farm ownership to approximately 330 acres.

From 1956 through 1968, Kathryn Keefe ("Keefe") personally operated the farm, hiring neighboring farmers to use their machinery to plant and to harvest the crops according to her directions. In 1969, Keefe first entered into an oral crop-share arrangement with a neighboring farmer, Arthur Wetzell. She continued this for each year thereafter through 1975.

---

**1.** We grant special use valuation in the instant case because we conclude, for reasons stated below, that the particular *adjustable* cash rent lease presented by these facts is substantially dependent upon production. In *Martin v. Com-* *missioner,* 783 F.2d 81, 84 (7th Cir.1986), we denied special use valuation on the ground that a *fixed* cash lease is not dependent upon production.

Under the terms of the oral crop-share arrangement, Keefe and Wetzell jointly decided what crops would be planted, how many acres would be planted in each crop, and what crop rotation would be used. Each winter Wetzell would propose a plan for the amount and location of each crop to be planted; however, Keefe and Wetzell continued the crop rotation pattern Keefe had developed earlier. Keefe consulted with Wetzell generally two or three times a week during the planting and harvesting seasons, and usually at least once a week during the remainder of the year. Each year Wetzell paid 50 percent of the cost of fertilizer, seeds, and supplies, and 100 percent of the fuel. Keefe paid 50 percent of the production costs and 100 percent of the utilities. She kept her own records and dealt directly with suppliers.

Keefe and Wetzell agreed in late 1975 and early 1976 to continue the crop-share arrangement for the 1976 crop year. They planned the necessary purchases, bought supplies, and decided on the crops to be planted. In early 1976, however, Keefe's health began to deteriorate. As a result, in February and March of 1976, Kathryn's nephew Edward Keefe discussed with Wetzell the possibility of entering into a cash lease so that Keefe would not have to participate actively in the operation of the farm. Keefe and Wetzell executed a new written lease for the 1976 season sometime between March and May of 1976.

The 1976 lease provided that Wetzell would pay a fixed cash rent of $80 per acre for a total annual rent of $26,240. Although Wetzell as lessee assumed sole responsibility for the operation of the farm, he ran the farm according to the plans for the 1976 season that Keefe and he had already jointly made. Moreover, he continued to consult with Keefe about the management of the farm at least two or three times a month. Throughout 1976, Keefe continued to inspect the farm regularly. She made repairs to the farm buildings, including rerofing the barn and repaving the driveway to the grainery. Also in 1976, she sold her share of the 1975 crop.

In November 1976, Keefe and Wetzell signed a lease for the 1977 crop year. The 1977 lease provided that Wetzell would pay a cash rent of $32,600 if certain grain production and price levels were met. If the 1977 crop yields and prices were as low as the 1976 yields and prices, however, Wetzell would not have been able to pay rent in the amount of $32,600 without suffering a loss. He therefore desired protection against the possibility of poor production and low prices. Thus, Wetzell proposed and Keefe accepted a rent-adjustment clause that stated:

> It is a condition of this lease that if at the time of actual harvest, and providing that harvest is completed by December 31, 1977, the gross income derivable to tenant under this lease if sale were made at the time of harvest shall, without any neglect on the part of the tenant, be shown by tenant to be less than an amount equal to an average production of 70 bushels per acre of corn times a price of $2.25 per bushel per number 2 corn, then the annual rent shall be adjusted to $26,080.

1977 Lease ¶ 16. Thus, if Wetzell's gross income from the lease of Keefe's farmland fell below $51,660, which is the amount that would be realized by the sale of the crops grown on the 328 acres under cultivation, assuming a yield of 70 bushels of corn per acre and a price of $2.25 per bushel, then the annual rent would be adjusted downward 20 percent from $32,600 to $26,080.

Keefe died on April 23, 1977. Shortly before her death, on April 10, 1977, she had transferred all of her property, including the 330 acres of farmland, into a trust for the benefit of herself and her nieces and nephews. On January 24, 1978, taxpayers, as trustees of the trust, timely filed a federal estate tax return. They elected to value the land at its special use valuation under I.R.C. § 2032A. Although the land's fair market value is $686,000, its special use valuation if it qualifies under § 2032A is $191,259. Upon an audit of the return, however, the IRS denied the special use

valuation on the ground that the farmland was not being used for a "qualified use" on the date of Keefe's death. It also disallowed the state death tax credit. Taxpayers paid an additional assessment of $182,-822 allocated as follows:

| Item disallowed | Assessment | Interest |
|---|---|---|
| Special Use Valuation | $114,224 | $30,668 |
| State Death Tax Credit | $ 29,902 | $ 8,028 |

The government later conceded that taxpayers were entitled to a credit for the state death taxes. Nevertheless, it denied a refund for the $8,028 of interest paid as a result of the initial disallowance of the state death tax credit.

Taxpayers filed this action for recovery of the $114,224 plus interest paid after denial of the special use valuation, and for a refund of the $8,028 paid as interest due to the initial disallowance of the state death tax credit. With regard to the special use valuation, the government conceded that Keefe had satisfied all of the elements of § 2032A other than the qualified use requirement. That condition requires that the property be used for a qualified use, such as farming, by the decedent or a member of her family at the date of her death.

The government maintained below and the district court ruled on September 14, 1983, that Keefe would have satisfied the qualified use test if, at the date of her death, either she materially participated in the operation of the farm, or her rental income was substantially dependent upon the production of crops raised on the farmland. *See Schuneman v. United States,* 570 F.Supp. 1327 (C.D.Ill.1983). The case went to trial on January 19, 1984, on the factual issue as to whether Keefe materially participated in the operation of the farm; the district court directed a verdict that Keefe did not materially participate in the farm's operation at the date of her death. On January 31, 1984, the district court held as a matter of law that Keefe's rental income was not substantially dependent upon production.

With respect to the interest paid on the initially disallowed state death tax credit,

the district court ruled on September 14, 1983, that taxpayers were entitled to a refund of the $8,028 paid as interest attributable to the disallowance of the state death tax credit. The district court entered final judgment on August 28, 1984.

Taxpayers appeal from the district court's order that Keefe's income was not substantially dependent upon production; however, they have not appealed from the directed verdict that Keefe did not materially participate in the operation of the farm. The government cross-appeals from the order requiring a refund of interest paid on account of the initial disallowance of the state death tax credit.

## II

Section 2032A of the Internal Revenue Code was originally enacted as part of the Tax Reform Act of 1976, Pub.L. No. 94–455, 90 Stat. 1520, 1856. The purpose of § 2032A was to encourage the continued operation of family farms and other small family businesses by permitting real property used for the farm or business to be valued upon its present use, rather than upon its highest and best use. Thus, § 2032A relieves taxpayers from having to sell an eligible family farm or business when the income from its present use is insufficient to pay the tax calculated upon its highest and best use. *See Estate of Sherrod v. Commissioner,* 774 F.2d 1057, 1061–62 (11th Cir.1985); *Estate of Cowser v. Commissioner,* 736 F.2d 1168, 1170 (7th Cir.1984). In order to qualify for special use valuation, five conditions must be met: (1) the decedent must have been a citizen or resident of the United States; (2) the property, the value of which must exceed certain percentages of decedent's gross and adjusted estate, must be located in the United States; (3) the property must pass to a qualified heir, who must be a member of the decedent's family; (4) the decedent or a member of decedent's family must materially participate in the operation of the farm or business in 5 of the 8 years preceding decedent's death; and (5) the property must have been used for a quali-

fied use by the decedent or a member of decedent's family at the date of decedent's death. *See* I.R.C. § 2032A; *see also Estate of Abell v. Commissioner*, 83 T.C. 696, 699 (1984). In this case, the government concedes that Keefe has satisfied all the conditions for special use valuation other than the qualified use requirement. Thus, the question we must decide is whether the 330 acres of farmland was used for a qualified use by Keefe or a member of her family at the date of her death.

As initially enacted, § 2032A(b)(1)(A)(i) required that the property, "on the date of the decedent's death, was being used for a qualified use." Section 2032A(b)(2), which provides that "the term 'qualified use' means the devotion of the property to ... (A) use as a farm for farming purposes, or (B) use in a trade or business other than the trade or business of farming," affords special use valuation to both farms and other businesses. Section 421(b)(1) of the Economic Recovery Tax Act of 1981 ("ERTA"), Pub.L. No. 97–34, 95 Stat. 172, 306, amended § 2032A(b)(1) to require that the property, "on the date of decedent's death, was being used for a qualified use by the decedent or a member of the dece-

dent's family." Section 421(k)(5)(A) of ERTA made this amendment retroactively effective to the estates of decedents dying after December 31, 1976.[2] *See* 95 Stat. at 314.

The legislative history underlying the 1981 amendment suggests by negative implication that the qualified use requirement of § 2032A(b)(1) is satisfied if the income from rental of the property is substantially dependent upon production. To be specific, Senate Report No. 144, 97th Cong., 1st Sess., at 133, *reprinted in* 1981 U.S.Code Cong. & Ad.News 105, 234, states that "during any period when the decedent leases the real property to a nonfamily member for use in a qualified use pursuant to a lease under which the rental is not substantially dependent upon production, the qualified use requirement is not satisfied." On the basis of this statement, the district court held that property is used for a qualified use for the purpose of § 2032A(b)(1) if the income from rental of the property is substantially dependent upon production. *See* 570 F.Supp. at 1331–32. We agree.

■ The district court reasoned that the issue as to whether rental income is sub-

---

**2.** Taxpayers maintain that § 2032A, prior to the 1981 amendment, required only that the property be used for a qualified use, but did not require that it be used for a qualified use by the decedent. They argue that, because Wetzell was using the property as a farm, the literal language of the unamended § 2032A(b)(1)(A)(i) was satisfied. In their view, retroactive application of the 1981 amendment would impose an additional condition on eligibility for special use valuation not present in the 1976 enactment, namely, that the decedent or a member of her family must use the property for a qualified use. This, they assert, would violate due process.

Under taxpayers' view, the only situation in which the qualified use test would not be met would be where the land was not used for any trade or business. Contrary to taxpayers' contentions, the legislative history of the 1976 enactment and of the 1981 amendment demonstrate that § 2032A as originally enacted required that the property be used for a qualified use by the decedent. *See* H.R.Rep. No. 1380, 94th Cong., 2d Sess. at 23 (1976), 1976 U.S.Code Cong. & Ad.News, 2897, 3377 ("The mere passive rental of property will not qualify."); H.R. Rep. No. 201, 97th Cong., 1st Sess. at 165 (1981) ("The bill does not change the present law re-

quirement that this use be an active trade or business use as opposed to a passive, or investment use."); S.Rep. No. 144, 97th Cong., 1st Sess. at 133 (1981), 1981 U.S.Code Cong. & Ad. News, 105, 233; *see also, e.g., Estate of Sherrod v. Commissioner*, 744 F.2d 1057, 1064 (11th Cir. 1985) (citing cases for the proposition that "it does not matter to what use a tenant put the land; the focus is on what the decedent did with the land."). Rather than restricting the eligibility for special use valuation, the 1981 amendment expanded eligibility by allowing the property to be used for a qualified use by either the decedent or a member of her family. Congress made the amendment retroactive so that all estates could benefit from the liberalization of the test. *See* H.R.Rep. No. 201, 97th Cong., 1st Sess. at 168 ("[A] number of technical requirements of the current use valuation provision have resulted in incomplete relief being received by the owners of many family farms and other businesses which this committee wishes to aid."). Because the 1981 amendment does not impose upon taxpayers any conditions not already present in the 1976 enactment, the issue of the constitutionality of its retroactive application does not arise.

stantially dependent upon production is a question of law because it involves a matter of contract interpretation. In our view, however, there is no dispute about the meaning of any term in the 1977 lease. Rather, we believe that the issue is a mixed question of law and fact "in which the historical facts are admitted or established, the rule of law is undisputed, and the issue is whether the facts satisfy the statutory standard." *See Pullman-Standard v. Swint,* 456 U.S. 273, 289 n. 19, 102 S.Ct. 1781, 1790 n. 19, 72 L.Ed.2d 66 (1982). Although there exists a conflict among the circuits concerning the proper standard of review of mixed questions of law and fact, *see id.,* in this circuit such determinations are independently reviewable by an appellate court. *See United States ex rel. Tonaldi v. Elrod,* 716 F.2d 431, 437 (7th Cir. 1983).

We must determine whether the rent from the 1977 lease was substantially dependent upon production. The government admits that income from a crop-share agreement, such as Keefe's arrangement with Wetzell from 1969 through 1975, is entirely dependent upon production because even a slight change in crop yields or prices will change the landowner's rent. Taxpayers do not contest that income from a fixed cash lease, such as the lease for the 1976 crop year, is not dependent upon production.[3] Moreover, the government conceded below, *see* Supplemental Memorandum of Law for the Defendant, at 8, *Schuneman v. United States,* 570 F.Supp. 1327 (C.D.Ill.1983), and agreed in oral argument, that the rental income from the 1977 lease "was somewhat dependent upon production."

We look first to the terms of the 1977 lease. It contained a rent-adjustment clause that provided that Wetzell would

pay a total annual rent of $32,600 if his gross income from Keefe's farmland met or exceeded $51,660, and that he would pay a total annual rent of $26,080 if his gross income was less than that level. The effect of this provision was to allocate a portion of the risk of poor production or low prices to Keefe.[4] Her possible incomes would differ by $6,520, or 20 percent of her maximum possible income, depending upon crop yields and prices.

Nevertheless, the same lease on separate parcels of land can expose the respective landowners to different degrees of risk, that is, to differing variabilities in possible income. An agreement with terms identical to Keefe's 1977 lease would subject the owner of very productive farmland to a low degree of risk because the rent-adjustment clause rarely would be triggered; the owner of very unproductive farmland also would incur a low degree of risk because it would be nearly certain that the rent-adjustment clause would be triggered. When the gross income produced by a parcel of farmland equally falls on both sides of the amount that triggers the rent-adjustment clause, however, the same contract would subject the owner of moderately productive farmland to a higher degree of risk because it would be as likely that the rent-adjustment clause would be triggered as that it would not be triggered.

We, therefore, cannot look solely at the face of the 1977 lease, but also must examine the production history of Keefe's farmland to determine whether the rent-adjustment clause was likely to have been triggered. Keefe's income under her crop-share agreement with Wetzell provides a benchmark against which we can compare the variability in income under the 1977 lease. According to the uncontested affidavit of Milo Konopik, a professional farm

---

**3.** This was the case in *Martin v. Commissioner,* 783 F.2d 81, 84 (7th Cir.1986) and *Estate of Sherrod v. Commissioner,* 774 F.2d 1057, 1064 (11th Cir.1985).

**4.** Under the 1977 lease, Keefe did not bear any of the risk of changes in the prices of seed, fertilizer, insecticide, herbicide or fuel because

changes in such production costs would not affect Wetzell's gross income. In contrast, under her crop-share arrangement with Wetzell, she had assumed the risk of changes in the prices of seed, fertilizer, herbicide, insecticide and utilities, but not of fuel. Of course, she did not bear any risk under the 1976 lease.

appraiser hired by taxpayers to examine Keefe's records, Keefe's gross crop income for the crop years 1972 through 1975 when she crop-shared with Wetzell ranged from a low of $25,142 in 1973 to a high of $37,057 in 1975. In other words, over these four years, her actual income varied by $11,915, or 32 percent of her maximum income during the period. Konopik also determined that the production and price levels set in the 1977 lease were not achieved in two of the four years, indicating that there was an equal probability that the rent-adjustment clause in the 1977 lease would be triggered.

■ Whereas the actual variation in the income from 1972 to 1975 was $11,915, or 32 percent of the maximum income during the period, the potential variation in income in 1977 was $6,520, or 20 percent of the maximum possible income.[5] Thus, the possible variation in income in 1977 encompassed more than 50 percent of the actual variation in income over the four most recent years in which Keefe crop-shared with Wetzell. Having determined that there was a substantial likelihood that the rent-adjustment clause of the 1977 lease would be triggered and having compared the possible incomes under the 1977 lease with the actual income from 1972 through 1975, we hold that the rental income under the 1977 lease was substantially dependent upon production.

The government argues, however, that Keefe's rental income was not substantially dependent upon production under the 1977 lease because Keefe was guaranteed a minimum income of $26,080 and because there were only two possible levels of income—$26,080 or $32,600. Still, "[i]t is never right to try to answer a legal question ...

without considering the purpose of the question." *United States v. Cerro*, 775 F.2d 908, 912 (7th Cir.1985). The government's objections overlook the purpose of our inquiry. The purpose of asking whether the rental income is substantially dependent upon production is to determine whether the decedent had held the farmland for an active trade or business use as opposed to a passive investment use.[6] We can answer this question by determining whether she had assumed risk under the lease substantially approaching the risk that she would have incurred had she farmed the land herself.

Neither of the government's objections negate the conclusion that Keefe bore a financial risk substantially equivalent to that she would have borne had she personally operated the farm, as she had done from 1956 through 1968, or had she crop-shared with Wetzell, as she had done from 1969 through 1975. As for the argument that the lease guaranteed Keefe a minimum income of $26,080, as a practical matter, the farmland's production history all but guaranteed Keefe a minimum rent even under the crop-share arrangement. For example, Keefe's lowest income during the final four years of her crop-share agreement was still $25,142. With regard to the objection that the lease provided for only two possible levels of income, the number of possible returns alone is not indicative of the variability of income. Both the number of possible returns, the range between the returns, and the likelihood of the respective returns are necessary to determine the variability in income under a lease. As an illustration, the 1977 lease would not be substantially dependent upon production even if it provided for 10

---

**5.** Few would dispute that a 20 percent reduction in income of $6,520 is substantial to a person who earns at most $32,600 per year.

**6.** As discussed above, for property to receive special use valuation, § 2032A(b)(1) requires that the property be used for a qualified use by the decedent or a member of decedent's family on the date of decedent's death. This use must be an "active trade or business use as opposed to a passive, or investment use." H.R.Rep. No.

201, 97th Cong., 1st Sess. at 133 (1981). Although "[t]he mere passive rental of property will not qualify," H.R.Rep. No. 1380, 94th Cong., 2d Sess. at 23 (1976), 1976 U.S.Code Cong. & Ad.News at 3377, the qualified use requirement is satisfied by rental of property pursuant to a lease that is substantially dependent upon production. *See* S.Rep. No. 144, 97th Cong., 1st Sess. at 131 (1981), 1981 U.S.Code Cong. & Ad. News at 231.

possible levels of income which were $10 apart, or for 100 possible levels of income which were only $1.00 apart, because the overall variability of income would be insignificant. We therefore reject the government's suggestion that some particular number of possible incomes is necessary for a lease to be substantially dependent upon production,[7] and we conclude that the variability of income under the 1977 lease is such that Keefe's income was substantially dependent upon production at the date of her death.[8]

Because Keefe's income was substantially dependent upon production for the purposes of § 2032A(b)(1)'s qualified use requirement, taxpayers are entitled to special use valuation of the 330 acres of farmland.

### III

The sole issue presented by the government's cross-appeal is whether taxpayers are entitled to a refund of interest paid as a result of the initial disallowance of the state death tax credit. The district court ruled that taxpayers are entitled to a refund of the entire $8,028 paid.

Section 2011 of the Internal Revenue Code allows a state death tax credit for "any estate, inheritance, legacy or succession taxes actually paid to any State or the District of Columbia, in respect of any property included in the gross estate." The Commissioner has promulgated regulations establishing the procedure by which taxpayers may claim a credit of state death taxes that they have paid. Section 20.-2011–1(c)(2) of the Treasury Regulations on Estate Tax provides in part:

> Before the credit for State death taxes is allowed, evidence that such taxes have been paid must be submitted to the district director.... The required evidence should be filed with the return, but if that is not convenient or possible, then it should be submitted as soon thereafter as practicable.

■ In this case, taxpayers filed the federal estate tax return, claiming a credit for payment of the Illinois inheritance tax, on January 24, 1978; however, taxpayers did not pay the state death tax until one month later, on February 23, 1978. Taxpayers did not obtain a receipt from the County Treasurer until November 17, 1978. Moreover, they did not deliver a copy of the County Treasurer's receipt, countersigned by the Illinois Attorney General, to the Internal Revenue Service until December 22, 1980. Taxpayers do not explain why the receipt

---

**7.** A "two-tier" adjustable cash rent lease, however, might not be substantially dependent upon production if the range between the tiers is relatively narrow or if it would be unlikely that a particular tier would be triggered.

**8.** The government also argues that Keefe did not satisfy the Treasury Regulations on Estate Tax, § 20.2032A–3(b)(1) (26 C.F.R.), which provide in pertinent part that the "decedent or a member of the decedent's family must own an equity interest in the farm operation." Although we have not found any statutory language or legislative history on this point, we will defer to the Commissioner's interpretation of § 2032A(b)(1) as promulgated in the Treasury Regulations. *See United States v. Vogel Fertilizer Co.*, 455 U.S. 16, 24, 102 S.Ct. 821, 827, 70 L.Ed.2d 792 (1982). Nevertheless, the Commissioner did not define "equity interest" or illustrate the concept with an example. In its arguments before the district court, the government relied upon Webster's Unabridged Third New International Dictionary definition of "equity" as meaning "a risk interest or ownership right in property." *See* Supplemental Memorandum of Law for the Defendant, at 9, *Schuneman v. United States*, 570

F.Supp. 1327 (C.D.Ill.1983). For the reasons stated above, Keefe assumed substantial risk under the 1977 lease and therefore satisfied the equity interest requirement of Treasury Regulation § 20.2032A–3(b)(1).

Finally, the government argues from analogy to *Estate of Trueman v. United States*, 6 Cl.Ct. 380, 84–2 U.S. Tax Cas. (CCH) ¶ 13,590, at 86,-176 (1984), which held that a service station lease under which the rent was somewhat tied to the volume of gasoline sold was not substantially dependent upon production, that the lease in this case also was not substantially dependent upon production. *Trueman*, however, presented different facts. In that case, the "[p]laintiff did not receive a production payment from Shell until sales exceeded 384,000 gal. of gas, and the payments 1½¢/gal.) were not to exceed $1,800 in a year." *Id.* at 386, 84–2 U.S. Tax Cas. (CCH) ¶ 13,590. The relatively narrow variability of income in the service station lease in *Trueman* stands in contrast to the substantial difference in possible incomes in the lease involved in this case.

was not filed with the return, and offer no reason why it could not be obtained before December 22, 1980. Because the taxpayers failed to comply with the Treasury Regulations requiring proof of payment of the state death taxes until nearly three years after they had filed their return, we vacate the district court's order requiring a refund of the entire $8,028 paid in interest.

Nevertheless, when the government initially disallowed taxpayers' state death tax credit on April 30, 1981, it assessed interest from the date taxpayers filed the estate tax return, January 24, 1978, until the date they filed a claim for a refund of the assessed deficiency and interest that they had paid, which was June 8, 1981. We agree with the district court that the interest assessed from December 22, 1980, when taxpayers filed proof of their credit, through June 8, 1981, should be refunded. Indeed, the government admits that "treating th[e] [submission on December 22, 1980, of] verification [of payment of the Illinois inheritance tax] would be appropriate," and "concede[s], on that basis, that taxpayers are entitled to a refund of the approximately six months' interest assessed after the date the credit was properly claimed through presentation of verified evidence of payment." Appellee's Brief at 31 n. 9. We, therefore, remand the cross-appeal to the district court for a recalculation of the refund.[9]

## IV

For the reasons stated above, we reverse the district court's judgment in the appeal and remand with directions to enter judgment for the taxpayers consistent with this opinion. In the cross-appeal, we vacate the district court's refund order and remand for a recalculation of the refund of interest assessed for the period from December 22, 1980, until June 8, 1981.

SO ORDERED.

**9.** I.R.C. § 2011(c), which provides that a refund based on the state death tax credit "shall be made without interest," is inapposite. We do not order the government to pay interest on the credit that it ultimately allowed, but rather to refund interest that it improperly assessed once taxpayers had satisfied the Treasury Regulations by submitting verification of the payment of the Illinois inheritance tax.