Ruben W. **MANGELS**, Administrator of
the Estate of Luella R. Mangels,
deceased, Plaintiff,

v.

**UNITED STATES of America,**
Defendant.

Civ. No. 84–10–D–2.

United States District Court,
S.D. Iowa,
Davenport Division.

April 22, 1986.

Thomas C. Fritzsche, Bettendorf, Iowa,
for plaintiff.

Richard Turner, U.S. Atty., Christopher
D. Hagen, Asst. U.S. Atty., Des Moines,
Iowa, Peter Taylor, Trial Atty., Tax Div.,
U.S. Dept. of Justice, Washington, D.C.,
for defendant.

FINDINGS OF FACT, CONCLUSIONS
OF LAW, AND ORDER FOR
JUDGMENT

VIETOR, Chief Judge.

This is a refund suit for overpayment of
federal estate tax based upon the Internal
Revenue Service's refusal to permit a spe-
cial use valuation of certain farmland in the
estate. The case is submitted on stipulated
facts, set forth under Findings of Fact
below, and written briefs of the parties.

FINDINGS OF FACT

(1) During the period 1974 to 1980
Northwest Bank & Trust Company was the
conservator for Luella R. Mangels, the de-
cedent. The farm income was not reported
on Luella's income tax return as self-em-
ployment income for purposes of self-em-
ployment tax, and no self-employment tax,
interest or penalties (relating to the failure
to pay self-employment tax) were paid by
Luella or her conservator for the period
1974 to 1980 or by Luella's estate after her
death.

(2) Failure of the conservator to report
the farm income for 1974 to 1980 as self-
employment income was not intentional and
occurred because of the conservator's lack
of understanding of the complex provisions
of the Internal Revenue Code and related
regulations.

(3) From 1974 to 1980 the conservator
leased the tillable farmland on a crop-share
basis, and the pasture, timber and build-
ings on a cash basis to parties unrelated to
Luella.

(4) Luella lived in a nursing home away
from her farm from the time of her disabili-
ty in 1966 until the time of her death in
1980. Neither Luella, any member of her
family, nor the conservator had their princi-
pal place of residence on the farm between
1974 and 1980.

(5) No agents of the conservator who
participated in the operation of the farm
were related to Luella.

(6) Luella died intestate as a resident of Scott County, Iowa. Her estate has been administered under the supervision of the Scott County Probate Court.

(7) The fair market value of the farm as of the date of death was $424,000.

(8) Luella was, at all times relevant to the determination of the requisite period of pre-death "material participation" under section 2032A of the Internal Revenue Code (from August 15, 1974, through her death on August 15, 1980), physically and mentally incapacitated and unable to handle her own affairs.

(9) Luella was the ward of a conservatorship established by the District Court for Scott County, Iowa, during the period from 1966 through her death on August 15, 1980. The conservatorship was a voluntary conservatorship. (This latter fact was stipulated at the February 27, 1986, hearing on this case.)

(10) The conservator served as the court-appointed conservator for Luella for the period from 1974 through Luella's death on August 15, 1980.

(11) In all respects other than the statutory test of pre-death material participation by Luella, plaintiff qualifies for and is entitled to elect section 2032A valuation for the farm.

(12) The effect of allowing section 2032A valuation for the farm would be to decrease its valuation in the gross estate from $424,000 (fair market value) to $125,061, thereby reducing the taxable estate by $298,939.

(13) As a corporate entity the conservator acted via its agents and employees. During the 1974 to 1980 period the conservator's acts with respect to management of the farm were performed by Robert H. Lage, vice-president and agricultural representative. Detailed financial accounting respecting the income and expenditures of Luella's conservatorship during the period 1974 to 1980 were maintained by the conservator's trust department under the general supervision of Trust Officer Margo Hancock and were presented annually for approval by the Scott County Probate Court.

(14) All machinery and implements used on the farm between 1974 and 1980 were furnished by the tenant.

(14A) The availability of adequate machinery in appropriate quantity and condition was a significant factor evaluated by the conservator in deciding whether to enter into or maintain a crop-share lease with an individual tenant on the farm during the 1974 to 1980 period. (The government agrees that the facts in (14A) are undisputed, but objects to their relevancy.)

(15) Lage's activities respecting the farm during the 1974 to 1980 period included the following:

a) Lage gave daily attention for about ¼ of an hour to farm market reports. The farm property had no on-site storage, so the conservator's share of the crop that was delivered at time of annual harvest in October or November was forward marketed on the grain futures market, with annual commitment to 2 to 3 contracts for soybeans and 3 to 4 contracts for corn. Lage's attention to execution of contracts would require an estimated ½ hour per contract when committed.

b) Physical inspection of growing crop and farm ground respecting needs for fence and tile repairs took place on average once each quarter with an estimated 2 hours per inspection.

c) Additionally there was, on average, contact with the tenant once each month via telephone or office visit by tenant to bank concerning progress of crop, cultivation, herbicide and pesticide decisions and miscellaneous operating problems. These visits lasted an estimated 1 hour per month.

d) During the winter quarter (December-February) there was an additional 1½ to 2 hour session with the tenant concerning cropping decisions, counseling to the tenant respecting prospective year's operations plan, and assistance in preparing tenant's operating loan application for Northwest Bank & Trust Company Loan Committee.

e) Following harvest time in late fall an analysis of the cash equivalent rental effect of annual crop-share proceeds was computed for discussion with trust department personnel as a tool for evaluating advisability of renewal of crop-share lease. The average analysis time was about 4 hours.

f) From time to time extraordinary projects respecting long-term management of the farm were assumed. A good example was the 1979 cost sharing program with USDA Agricultural Stabilization and Conservation Service respecting construction of 1200 feet of 8″ drainage tile. This project included negotiations with government agents, creation of a cooperative agreement with adjacent landowners, retention and discussion with a contractor, and coordination with the tenant. The project took an estimated 20 to 25 hour time commitment.

(16) Relative to the farm for the 1974 to 1980 crop years:

a) The conservator and tenant jointly participated in cropping pattern and rotation decisions on an annual basis.

b) The conservator and tenant jointly participated in decisions involving level and formulae of fertilizer application and jointly shared the costs.

c) Decisions respecting participation or nonparticipation in the government price/income support program with regard to conservator's one-half share of the annual crop was made by the conservator. Similarly such decisions regarding tenant's one-half share were made by the tenant.

d) Decisions respecting plans for chemical weed and insect control were joint decisions of the conservator and tenant, and they jointly shared pesticide and herbicide costs.

e) Major conservation practice decisions (e.g., new tiling program in 1979) were the exclusive responsibility of the conservator.

f) Installation of tile lines was the exclusive responsibility of the conservator, although the project labor was provided by a third-party and to some extent by the tenant. Fence repair decisions were jointly made by the conservator and tenant with the conservator providing the material and the tenant providing the labor. No buildings were involved in the crop-share lease.

g) There were no storage facilities on the leased premises. One year the conservator initiated an arrangement with the tenant to store the conservator's share of grain on other tenant-controlled premises at a negotiated cost.

h) The conservator and tenant jointly decided such questions as moldboard vs. chisel technique plowing and minimum tillage techniques.

i) The conservator and tenant jointly made seed purchase decisions with joint sharing of cost.

j) The marketing of the conservator's share of the crop was exclusively done by the conservator. The tenant delivered the conservator's share of the crop at conservator's direction to the appropriate Mississippi River elevator.

(17) For the 1974 to 1980 period all final management decisions respecting marketing of the conservator's share of the crop were made by Mr. Lage. On average this included 2 to 3 soybean contracts and 3 to 4 corn contracts. Grain was delivered by the tenant as directed by Mr. Lage depending on the individual contract sale.

(18) For the 1974 to 1980 period, all crop planting decisions were joint, with initial proposal coming from the tenant subject to advice and consent of Mr. Lage. Harvesting decisions as to timing were jointly made by the tenant and Mr. Lage with Mr. Lage advising the tenant as to the conservator's delivery commitments per forward market commitments made exclusively by Mr. Lage. Cultivating and application of herbicide/pesticide decisions were jointly decided by tenant and Mr. Lage. The primary responsibility for implementation was with the tenant, under general supervision of Mr. Lage.

(19) If called as a witness Robert Lage would testify as he did in his November 8, 1984, deposition with regard to the process

of joint decision making between the conservator and tenant:

Q. And with respect to [stipulated fact (15)(c)], you estimated one hour of average contact with the tenant per month on the telephone. What would you discuss—

A. Telephone or office visit.

Q. What would you discuss?

A. Well, various things. Again, depending upon the season, what he was thinking in terms of the cropping program. You know, "Do you want to put beans over here in the hay field or corn?" You know, prior to making the decision, you might discuss, in our opinion, what might be the most profitable crop. You know, if beans are in short supply, it might be more advantageous to plant beans. In other words, we discussed cropping programs and various other things. We also happened to be banker for the tenant. In other words, I provided operating money—the bank, excuse me, provided operating money for input cost.

Q. That was on his own account?

A. Yes.

Q. Would you say that your conversations with him were in the nature of advice or were you participating in the decision as to what was decided?

A. Well, I think deciding—you know, actually should make him a part of the process. He might initiate a thought, but I would certainly either concur or suggest maybe we do something else, to make a decision as to what we were going to do.

Q. Your recollection is, during any of this period from 1974 on, was there any times in which you made the decision rather than the tenant, as you just described?

A. Well, I think what I was saying is that he may have made a suggestion and said, "I think maybe we ought to do this," and if I concurred, we'd say, "Fine." So who made the decision? I guess I approved—

Q. My question is, were there any times when you did not concur?

A. Very few.

Q. What happened on those occasions?

A. Well, we would change his thinking. We'd discuss it and perhaps do something else.

Q. Can you recall any of those?

A. Well, I don't specifically, but I'm sure there may have been a time or two when maybe he thought that a certain piece of ground might be growing little, and maybe we ought to do something else. Like, we decided to put beans in it instead of—

Q. I'll ask you basically the same question with respect to [stipulated fact (15)(d)]. When you describe the cropping decisions and counseling.

\* \* \* \* \* \*

Q. Would your answer be the same there, that you would seek—

A. Yeah.

[Plaintiff's Attorney]: I'm not sure I understand the question.

[Government's Attorney]: All right.

Q. [Government's Attorney] My question is whether or not decisions were made and the tenant was told what was to be done or whether or not the tenant was given advice.

A. Well, it's more than advice. The tenant might come in and say, "Look, I think I'd like to put corn over here and beans," and we'd go over the thing, and you say, "Yes, I think that would be fine." And being a good tenant, he's very knowledgeable also, but there were times when maybe I would override his suggestion, whether he should or not. Foster some thoughts. Of course, you understand, I think, he suggests—after the crop was harvested, you know, the tenant no longer has anything to do with our share of the crop. Whatever was done with our share of the crop was totally our decision as to when and where it would be marketed.

(20) From 1966 until Luella's death the farm was leased either to Arnold and Evelyn Petersen or Nesretep Farms, Inc., a

farm corporation formed by Arnold and Evelyn Petersen; Wayne Marxen, their son-in-law; and their families.

(21) Arnold Petersen and Wayne Marxen were experienced, knowledgeable and successful farmers, and the conservator took this factor into consideration when annually renewing its lease of the farm.

(22) Neither Lage nor any other agents or employees of the conservator performed any physical labor on the farm at any time.

## ISSUES PRESENTED

The parties have agreed that there are only two issues in this case.

(1) Whether the acts of a court-appointed conservator for a mentally and physically disabled decedent (date of death 8/15/80) can be imputed to the decedent for purposes of establishing "material participation" by the decedent under 26 U.S.C. § 2032A(b)(1)(C)(ii).

(2) Assuming the acts of such a court-appointed conservator are attributable to the decedent, did the acts of decedent's conservator for the six-year period immediately preceding decedent's death constitute "material participation" under 26 U.S.C. § 2032A(b)(1)(C)(ii).

To prevail in this case, plaintiff must prevail on both issues. Because the case is resolved by the court's determination of issue (2) in favor of defendant, issue (1) is not decided.

## LEGAL CONCLUSIONS

The acts of the conservator fall short of constituting "material participation" under 26 U.S.C. § 2032A(b)(1)(C)(ii) as clarified by 20 C.F.R. § 20.2032A–3(e), (g).[1] Factors to be considered are set out in 20 C.F.R. § 20.2032A–3(e)(2):

No single factor is determinative of the presence of material participation, but physical work and participation in management decisions are the principal factors to be considered. As a minimum, the decedent and/or a family member must regularly advise or consult with the other managing party on the operation of the business. While they need not make all final management decisions alone, the decedent and/or family members must participate in making a substantial number of these decisions. Additionally, production activities on the land should be inspected regularly by the family participant, and funds should be advanced and financial responsibility assumed for a substantial portion of the expense involved in the operation of the farm or other business in which the real property is used. In the case of a farm, the furnishing by the owner or other family members of a substantial portion of the machinery, implements, and livestock used in the production activities is an important factor to consider in finding material participation. With farms, hotels, or apartment buildings, the operation of which qualifies as a trade or business, the participating decedent or heir's maintaining his or her principal place of residence on the premises is a factor to consider in determining whether the overall participation is material. Retention of a professional farm manager will not by itself prevent satisfaction of the material participation requirement by the decedent and family members. However, the decedent and/or a family member must personally materially participate under the terms of the arrangement with the professional farm manager to satisfy this requirement.

---

**1.** Plaintiff notes that section 2032A(e)(6) provides that "[m]aterial participation shall be determined in a manner similar to the manner used for purposes of paragraph (1) of section 1402(a) (relating to net earnings from self-employment)." Based on section 2032A(e)(6), plaintiff appears to argue that to the extent the Treasury Regulations under 26 U.S.C. § 2032A create a standard that is more difficult to satisfy than the standard under section 1402(a), they are invalid. Treasury Regulations "must be sus-

tained unless unreasonably and plainly inconsistent with the revenue statutes." *Commissioner v. Portland Cement Co.*, 450 U.S. 156, 169, 101 S.Ct. 1037, 1045, 67 L.Ed.2d 140 (1981). *See Consolidated Blenders, Inc. v. United States*, 785 F.2d 259, 261 (8th Cir.1986). The court finds nothing unreasonably or plainly inconsistent between the regulations and section 2032A(e)(6). This court must give the regulations substantial weight. *Martin v. Commissioner*, 783 F.2d 81, 84 (7th Cir.1986).

A crop-share arrangement does not necessarily lead to a finding of no material participation by the landlord. *See Schuneman v. United States*, 783 F.2d 694, 695–96 (7th Cir.1986) (landlord-decedent, who lived right on the farm and, among other things, was personally involved in farming decisions weekly throughout the year and two or three times a week during planting and harvest seasons, was deemed to have materially participated). However, there must be more participating acts than appear in the stipulated facts in this case.

No agent of the conservator lived on the farm. No agent of the conservator did any physical work on the farm. The conservator did not furnish any part of the machinery and implements used in production activities. The conservator did participate with the tenant in management decisions, but the frequency of consultation with the tenant was low—one session each winter for 1½ to 2 hours and a one hour session about once a month, often on the phone. Mr. Lage made a two-hour inspection of the farm about once each quarter, not just to inspect the crops but also to inspect for general maintenance matters such as fence and tile repair needs. The conservator and tenant shared fertilizer, pesticide, herbicide, and seed costs. The conservator exclusively made decisions relating to marketing the landlord's share of the crop and relating to long-term management matters and capital improvements, such as a drainage tile project in 1979.

In short, the conservator's participation appears to have been no greater than that of the landlord in the typical crop-share lease arrangement. That is not enough to constitute "material participation" under the statute.

Based on the stipulated facts and weighing all the factors set out in the regulations, this court finds and concludes that the activities of the conservator did not constitute "material participation" in the operation of the farm as contemplated by 26 U.S.C. § 2032A(b)(1)(C)(ii).

ORDER FOR JUDGMENT

IT IS ORDERED that judgment be entered in favor of the defendant, United States of America, and against the plaintiff, Ruben W. Mangels, and that plaintiff's complaint is dismissed.