**Theron and George BAILEY, Co–Executors, Plaintiffs,**

v.

**UNITED STATES of America, Defendant.**

**No. C97–4075–PAZ.**

United States District Court, N.D. Iowa, Western Division.

Nov. 16, 1998.

**ORDER ON MOTION FOR SUMMARY JUDGMENT**

ZOSS, United States Magistrate Judge.

### I. INTRODUCTION

On August 25, 1997, the plaintiffs, Theron S. Bailey and George Byron Bailey ("the Baileys"), as co-executors of the estate of Ray V. Bailey, filed a complaint against the United States of America ("government"), seeking to recover federal estate taxes which they allege were illegally and erroneously assessed and collected from them. In particular, the Baileys

claim that they are entitled to a refund of $167,745.00, plus interest, representing additional estate taxes assessed by the Internal Revenue Service ("IRS") because of its determination that the estate did not meet the "qualified use" requirement for alternative "special use valuation" under the Internal Revenue Code § 2032A. The government answered the complaint on October 24, 1997, generally admitting the factual allegations in the complaint, but denying that the determination of the IRS with respect to the Baileys' refund claim was erroneous or illegal.

On July 8, 1998, the Baileys filed a Motion for Summary Judgment (Docket No.9) alleging that the property of the estate met the "qualified use" requirement of the special use valuation statute, 26 U.S.C. § 2032A, and that they are entitled to judgment as a matter of law. In support of their motion for summary judgment the Baileys filed a brief (Docket No. 10), a statement of undisputed facts (Docket No. 11), and a number of exhibits (Docket No. 12). The motion was resisted by the government on July 22, 1998 (Docket No. 13). The Baileys filed a reply brief on August 14, 1998 (Docket No. 16). The court heard arguments on the motion on September 10, 1998, and now considers the motion to be fully submitted.

## II. FACTUAL BACKGROUND

### A. Undisputed Facts

When Ray Bailey died on February 4, 1992, he owned, among other assets, two parcels of land in Clay County, Iowa—one known as the "Homestead," and the other known as the "Royal Farm."[1] By the terms of his will, both the Homestead and the Royal Farm passed to the Ray V. Bailey Trust, with the income from the trust apportioned between his two sons, Theron and George (the coexecutors of his estate, and the nominal plaintiffs in this case), and the corpus ultimately passing to Ray Bailey's grandchildren.

On Ray Bailey's federal estate tax return, which is dated October 30, 1992, the plaintiffs elected to value the farms at their "special use" values pursuant to Internal Revenue Code § 2032A. The special use value for the Homestead was $272,156, and the special use value for the Royal Farm was $171,900. The full market value of the farms would have been $488,000 for the Homestead and $410,000 for the Royal Farm. The aggregate decrease in the value of the two farms on the federal estate tax return from using their special use values was, therefore, about $454,000.

The IRS disallowed the estate's claim for special use valuations on the two farms, and in November 1995, the estate paid the additional amount due as a result of the deficiency assessment. In early 1996, the estate filed a claim for refund and request for abatement, challenging the denial of the special use valuations. The amount of the refund sought was $167,745.00, plus interest.

Over the years, Ray Bailey leased the Homestead and Royal Farm out pursuant to crop/livestock share agreements, until 1989, when he leased them out on three-tiered cash rent agreements. At the time of his death on February 4, 1992, the lease for the Homestead called for a minimum annual rent of $4,000, plus $85 per acre if corn production were less than 90 bushels per acre; $95 per acre if corn production were between 90 and 110 bushels per acre; or $100 per acre if corn production were more than 110 bushels per acre. The Homestead contained 281 tillable acres. At the time of Ray Bailey's death, the lease for the Royal Farm called for an annual rent of $90 per acre if corn production were less than 100 bushels per acre; $100 per acre if corn production were between 100 and 120 bushels per acre; or $ 110 per acre if corn production were more than 120 bushels per acre. The Homestead contained 180 tillable acres.

---

1. These properties will be collectively referred to in this opinion as "the farms."

## B. Disputed Facts

The parties are sharply divided on the mixed fact/law question of whether, at the time of Ray Bailey's death, the lease payments he was receiving for the farms were "substantially dependent on production." The Baileys claim that they were, and the United States claims that they were not.

## III. LEGAL ANALYSIS

### A. Standards for Summary Judgment

The standards for summary judgment have been described in detail in several recent decisions in this district. For example, the court in *Lockhart v. Cedar Rapids Community Sch. Dist.*, 963 F.Supp. 805 (N.D.Iowa 1997), outlined these standards as follows:

> The Eighth Circuit Court of Appeals recognizes "that summary judgment is a drastic remedy and must be exercised with extreme care to prevent taking genuine issues of fact away from juries." *Wabun–Inini v. Sessions*, 900 F.2d 1234, 1238 (8th Cir.1990). On the other hand, the Federal Rules of Civil Procedure have authorized for nearly 60 years "motions for summary judgment upon proper showings of the lack of a genuine, triable issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 327, 106 S.Ct. 2548, 2555, 91 L.Ed.2d 265 (1986). Thus, "summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" *Wabun–Inini*, 900 F.2d at 1238 (quoting *Celotex*, 477 U.S. at 327, 106 S.Ct. at 2554–55); *Hartnagel v. Norman*, 953 F.2d 394, 396 (8th Cir. 1992).

*Lockhart*, 963 F.Supp. at 813–815.

### B. Analysis

#### 1. Special use valuation

■ Section 2032A of the Internal Revenue Code ("IRC") was enacted to encour-age the continued operation of family farms, and other small family businesses, by permitting real property to be valued for federal estate tax purposes based on its actual use at the time of death rather than on its highest and best use. There are several conditions that must be met before property qualifies for this "special use valuation," only one of which is at issue in the present case: the property must have been employed in a "qualified use" by the decedent at the date of his death. 26 U.S.C. § 2032A(b)(1)(A)(I). For the farms to have been employed in a qualified use under the IRC, Ray Bailey's income from the farms, as landlord, must have been "substantially dependent upon production." *Schuneman v. United States*, 783 F.2d 694, 698 (7th Cir.1986).

#### 2. Substantially dependent on production

In *Schuneman v. United States*, 783 F.2d 694 (7th Cir.1986), the court analyzed whether the income paid to a landlord under a farm lease was "substantially dependent on production." In that case, the landlord leased out 330 acres for the 1977 crop year under a written lease that provided for the tenant to pay cash rent of $32,600 unless, at the time of the actual harvest, the gross income derivable to the tenant under the lease was less than $51,-660, in which event the cash rent would be reduced by 20%, or to $26,080. The landlord died during the lease period, and the estate elected to value the land at its special use valuation under Internal Revenue Code § 2032A. The IRS denied the special use valuation on the ground that the farmland was not in a "qualified use" on the date of the landlord's death. The estate filed suit to recover the amount of federal estate taxes paid as a result of the denial of the special use valuation. The district court held as a matter of law that the landlord's rental was not substantially dependent on production, and therefore that the farmland did not qualify for special use valuation.

The court of appeals held that the issue of whether the rental for the farmland was substantially dependent on production was "a mixed question of law and fact 'in which the historical facts are admitted or established, the rule of law is undisputed, and the issue is whether the facts satisfy the statutory standard.'" *Id.*, at 699, citing *Pullman–Standard v. Swint*, 456 U.S. 273, 289, n. 19, 102 S.Ct. 1781, 1790, n. 19, 72 L.Ed.2d 66 (1982). The court noted the agreement of the parties that in prior years the farmland had been rented out on a crop-share agreement, where the amount of the rental was entirely dependent on production, and on a fixed cash lease, where the amount of the rental was unrelated to production. *Schuneman*, 783 F.2d at 699. For 1977, however, the government did not agree that the rental was entirely, or even substantially, dependent on production, but conceded only that the amount of the rental was only "somewhat dependent on production." The court, therefore, undertook an analysis of the facts in the record to see if the rental was "substantially dependent on production" for purposes of section 2032A.

The court noted that under the two-tiered lease for 1977, the tenant would pay 20% less rental if the gross income from the farmland were below a certain level, thus allocating a portion of the risk of poor production to the landlord. The court went on to point out that the amount of risk to the landlord under the lease was, in part, determined by the likelihood that the rent reduction would be triggered. If the gross income from the farmland was routinely high enough to result in the payment of the higher level of rent, and only infrequently fell far enough to trigger the lower level of rent, then there would be only a low degree of risk that the landlord would receive the reduced rental payment.[2] *Id.*

The court, therefore, decided that it "must examine the production history of the farmland to determine whether the rent-adjustment clause was likely to have been triggered." *Id.* The court was able to do this because the taxpayer had submitted an uncontested affidavit from a professional farm appraiser who was able to calculate the gross income from the farmland for the 1972 through 1975 crop years. The appraiser determined that in two of these four years the rent-adjustment clause would have been triggered, "indicating that there was an equal probability that the rent-adjustment clause in the 1977 lease would be triggered." *Id.*, at 700. The court went on to point out that the variation in the landlord's actual income from farmland during those four years was 32% of the maximum income received, whereas in 1977, the variation was set at 20%.

The court stated that the reason for determining whether the rental received by the landlord was "substantially dependent on production" was to determine whether the farmland was held for an active business use as opposed to a passive investment use. *Id.*, at 700. See, *Williamson v. Commissioner Internal Revenue Service*, 974 F.2d 1525, 1531 (9th Cir. 1992); *Martin v. Commissioner of Internal Revenue*, 783 F.2d 81, 84 (7th Cir. 1986). The court went on to state that this question can be answered by determining whether the landlord has "assumed risk under the lease substantially approaching the risk that she would have incurred had she farmed the land herself." *Schuneman*, at 700. *See also Minter v. United States*, 19 F.3d 426, 429 (8th Cir .1994); *Heffley v. Commissioner of Internal Revenue*, 884 F.2d 279, 284–85 (7th Cir.1989).

The government in *Schuneman* argued that the landlord's risk was substantially reduced because she had a guaranteed minimum rental income and because there

---

**2.** The same would be true if the gross income from the farmland was routinely so low that the lower level of rent was usually paid, and only infrequently was high enough to trigger the higher level of rent.

were only two possible levels of rent. The court rejected the government's first argument because the lowest amount of rent the landlord had received in the four earlier years was about the same as the guaranteed minimum rent payable under the 1977 lease. *Schuneman,* 783 F.2d at 700. The court also rejected the government's second argument, pointing out that "the number of possible returns, the range between the returns, and the likelihood of the respective returns are necessary to determine the variability in income under a lease." *Id.* The court then, abruptly and without further analysis or rationale, held that "the variability of income under the 1977 lease is such that [the landlord's] income was substantially dependent upon production at the date of her death." *Id.,* at 701.

This court has examined the *Schuneman* decision in such detail because it is the only reported decision which deals directly with the question of whether rental payments received by a taxpayer on farmland owned at the time of death were substantially dependent on production. In the final analysis, however, the decision provides this court with little guidance. The *Schuneman* court gives no method for determining whether the risks assumed by a landlord under a lease approach the risks of farming, nor does the court give any real guidance for answering the ultimate question of whether rental payments received under such a lease are substantially dependent on production.

The Court of Appeals for the Eighth Circuit has spoken on this general subject twice. In *Minter v. United States,* 19 F.3d 426 (8th Cir.1994), the court dealt with cash leases by family members to a family farm corporation during the recapture period under section 2032A(c)(1) (ten years after death). The court held that since the cash lease in the case was, in essence, a lease by the owners of the farmland to themselves during the recapture period, their income from the farmland was entirely dependent on the success of the farming operation:

> Unlike landowners entering into leases with another farmer who takes on the risks and agrees to pay fixed rent whether the farming operation is profitable or not, the [owners] assumed substantially the same risks under the trustee's leases as they would have incurred by farming the land themselves. If the corporation's farming operation flourished, the sisters received their rent income; otherwise not. Indeed, the undisputed facts refute the Government's argument that the leases insulated the sisters from the risks of farming. During the period covered by the trustee's leases, the [owners] each lost over $25,000 from the corporation's farming activities.

*Id.,* at 429. *But see Williamson v. Commissioner Internal Revenue Service,* 974 F.2d 1525 (9th Cir.1992); "Recent Caselaw and Legislative Developments Concerning Special Use Valuation of Farm and Ranch Property," 3 Drake J. Agric. L. 119, 131–35 (1998).

In *Gavin v. United States,* 113 F.3d 802 (8th Cir.1997), the court again dealt with the qualified use question under a lease of farmland by the heirs of an estate during the ten-year recapture period. The lease in question provided for rent of $10,000 or, at the option of the renter, a $50\%$ crop share. *Id.,* at 807. The court held that the lease left the heirs of the estate with the same financial risk they would have faced if they had farmed the land themselves. "Had Parcel One's crop ... suffered because of weather, disease, or fluctuation prices to such an extent that the value of 50% of the sales proceeds dropped to less than $10,000, [the tenant] could have exercised his option to pay crop share rather than cash rent. Instead, depending on weather, disease, and fluctuating prices, [the heirs] might have earned something less than $10,000, or nothing at all." *Id.* The court went on to evaluate the risks of the landlord under the lease as follows:

Indeed, [the tenant's] option to pay cash rent decreased the return that the other heirs could expect. The option to pay cash rent for Parcel One effectively capped the heirs' income from Parcel One at $10,000, without in any way reducing the downside potential faced by the heirs in the event that the crop ... sales suffered. If a 50% crop share were worth more than $10,000, [the tenant] could and reasonably would have paid $10,000 in cash rent, thereby preventing the heirs from participating in the upside potential of an extremely profitable year. As a result, the terms of the lease forced the heirs to accept all the downside potential of bad years without enjoying the upside potential of good years—an arrangement inconsistent with the heirs being "mere landlords collecting a fixed rent." (citing *Minter*, 19 F.3d at 429)

*Id.*, at 807–808.

The analysis of the court in *Gavin* is helpful in the present case, but not determinative. The lease in *Gavin* permitted a rental of from nothing to $10,000, which would, on its face, leave the landlords with substantial risk. However, the court failed to undertake any analysis of the *likelihood* of the tenant paying any particular rent. As the court pointed out in *Schuneman*, the amount of risk to the landlord under a lease is, in part, determined by the likelihood that the rent reduction would be triggered. *Schuneman*, 783 F.2d at 699. If the crop on the Parcel One in *Gavin* was routinely high enough to result in the payment of $10,000, and only infrequently was low enough for the tenant to pay a crop share, then there would be only a low degree of risk that the landlord would receive less than $10,000 in rental. As the court in *Schuneman* stated: "the number of possible returns, the range between the returns, and the likelihood of the respective returns are necessary to determine

the variability in income under a lease." The court in *Gavin* did not have the last category of information.

In the present case, the court must determine whether the Baileys have shown that there are no genuine, triable issues of material fact, and that they are entitled to judgment as a matter of law. The Baileys are hampered in their efforts to make such a showing because there are no records of crop production for the Homestead or the Royal Farm for any years before 1992, the year of Ray Bailey's death.[3] In *Schuneman* the court had records from four prior years, and from those records was able to extrapolate the risk to the landlord. Here, the Baileys attempt to substitute Iowa State University corn yield averages for the district that includes Clay County in place of the actual historical records of the farms, to use those averages to demonstrate the degree of risk to the Baileys under the 1992 leases, and then to compare that risk to the facts in the *Schuneman* case. The Baileys attempt to buttress their conclusion with net income figures for the farms for the five-year period from 1989 through 1993.

The government responds to the motion for summary judgment by arguing that there are issues of material fact that preclude summary judgment. The government relies, in large part, on a declaration from Hal Tucker, who has been retained by the government as an expert witness. Mr. Tucker states that, from his review of the leases and of the information relied on by the Baileys to support their motion for summary judgment, the Homestead and Royal Farm leases were "not substantially dependant on production." Declaration dated July 21, 1998, ¶ 5. He also opines that "regional averages of farm production are too general to provide an adequate or meaningful assessment of the production risk associated with a particular farm.... The actual production on any given farm

---

**3.** Before that year, a substantial amount of the corn grown on the farms was fed to livestock under a crop/livestock share agreement, and records of actual production were not kept.

**1138**

will vary significantly more than a regional average. It is my opinion that the Bailey farms would likely have outperformed the average for Northwest Iowa." *Id,* ¶ 6.

 The court gives no weight to Mr. Tucker's conclusion on the issue of substantial dependence on production, but the court finds that his opinion on the productivity of the Bailey farms creates a factual issue for trial. The Baileys' argument on the substantial dependence on production test relies on the applicability of regional historical crop yields to two specific farms. Mr. Tucker's declaration has called the applicability of that data into question. The court will need a trial to analyze the three-tiered leases for 1992 for the Bailey farms and to determine whether or not, under the particular facts of this case, the variability of the potential income the landlord could have reasonably expected to receive under the 1992 leases was such that the landlord's income was substantially dependent upon production. *Schuneman,* 783 F.2d at 701.

The court is not persuaded that the Schuneman analysis is adequate to address the question of substantial dependency on production, or the underlying and related question of whether the risks to the landlord under a lease are substantially equivalent to the risks of personally operating the farm. Obviously, an analysis of the purported risks under the leases, and the likelihood of their occurrence, will be an appropriate subject for the parties to address at trial. However, the court will look beyond tortured statistical analyses, and will attempt to address whether the risks assumed by the Baileys under the farm leases were, or were not, substantial, and whether or not those risks caused the amount of rent due under the leases to be substantially dependent on production.[4]

## IV. CONCLUSION

Based upon the foregoing analysis, the court finds that plaintiffs' motion for summary judgment should be denied.

**IT IS SO ORDERED.**

---

4. To do this, the court will need a working definition of the terms "substantial" and "substantially." Courts have given these terms widely different meanings, depending on the context. *See Victor v. Nebraska,* 511 U.S. 1, 19, 114 S.Ct. 1239, 1250, 127 L.Ed.2d 583 (1994) ("substantial" means either "not seeming or imaginary" or "that specified to a large degree" in the context of a reasonable doubt instruction, citing Webster's Third New International Dictionary 2280 (1981)); *Kluener v. Commissioner of Internal Revenue,* 154 F.3d 630, 637 (6th Cir.1998) ("substantial" means something less than a preponderance, but more than a mere reasonable basis, citing 26 C.F.R. ¶ 1.6662–4(d)(3) (1997)); *Id.,* at 639 ("substantial" means "considerable" or "ample"); *Grand Canyon Air Tour Coalition v. Federal Aviation Administration,* 154 F.3d 455, 474 (D.C.Cir.1998) ("substantial" may well be defined as meaning "more than half," "being that specified to a large degree or in the main," "not seeming or imaginary," "considerable in amount"); *York Products, Inc. v. Central Tractor Farm & Family Center,* 99 F.3d 1568, 1572–73 (Fed.Cir.1996) ("substantially" means "considerable in ... extent," citing American Heritage Dictionary Second College Edition 1213 (2d ed.1982) or "largely but not wholly that which is specified," citing Webster's Ninth New Collegiate Dictionary 1176 (9th ed.1983)); *Koch v. United States,* 47 F.3d 1015, 1021 (10th Cir.1995) ("substantially" means "justified in substance or in the main—that is, justified to a degree that could satisfy a reasonable person." (citations omitted)); *Laitram Machinery, Inc. v. Carnitech,* 884 F.Supp. 1074, 1085 (E.D.La.1995) (definition of "substantially" in a patent case is a jury question); *C.E. Equipment Co., Inc. v. United States,* 17 Cl.Ct. 293, 299 (1989) ("substantially" means "less than totally"); *Darlington v. Studebaker–Packard Corporation,* 191 F.Supp. 438, 439 (N.D.Ind.1961) ("The word 'substantially' is a relative term and should be interpreted in accordance with context of claim in which it is used."). At trial, the court will expect the parties to propose appropriate definitions for these terms for the court to use in deciding this case.