**Beryl P. WILLIAMSON, Petitioner–Appellant,**

v.

**COMMISSIONER INTERNAL REVENUE SERVICE, Respondent–Appellee.**

No. 89–70506.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted May 7, 1991.

Decided Sept. 14, 1992.

---

Robert K. Smith, Shannahan, Smith & Dailey, La Jolla, Cal., for petitioner-appellant.

Bruce R. Ellisen, Tax Div., U.S. Dept. of Justice, Washington, D.C., for respondent-appellee.

Before: TANG, REINHARDT, and WIGGINS, Circuit Judges.

TANG, Circuit Judge:

Beryl Williamson inherited farm land from his mother in 1983. In the estate tax return, Williamson elected the special use valuation for the property provided by 26

U.S.C. § 2032A. Williamson subsequently leased the farm to his nephew for a fixed, semi-annual cash payment. In 1987, the Internal Revenue Service ("IRS") issued a Notice of Deficiency to Williamson, asserting that the cash lease rendered the land ineligible for special use valuation. The Tax Court agreed with the IRS. Williamson appeals. We affirm.

## BACKGROUND

### A. *Statutory Framework*

Generally, for purposes of estate taxes, a decedent's property is taxed at its fair market value at the time of death. *See* 26 U.S.C. § 2031; 26 C.F.R. § 20.2031–1(b).[1] As a consequence, prior to 1976, heirs were often forced to sell family farms because the farm could not produce sufficient profits to finance the estate tax debt. *See* H.R.Rep. No. 1380, 94th Cong., 2d Sess. 22, *reprinted in* 1976 U.S.C.C.A.N. 2897, 3356, 3376 ("In some cases, the ... [fair market value] estate tax burden makes continuation of farming ... not feasible because the income potential from these activities is insufficient to service extended tax payments or loans obtained to pay the tax.").

In 1976, Congress carved out an exception to the estate tax valuation rules in the hope of protecting the family farm.[2] Congress permitted those who inherited qualifying family farms to elect a special use valuation of the property based on the property's actual use rather than its fair market value. 26 U.S.C. § 2032A(a).

Congress carefully delineated the types of property eligible for special use valuation. The property must be real property located in the United States which was "acquired from or passed from the decedent to a qualified heir of the decedent and which, on the date of the decedent's death, was being used for a qualified use by the decedent or a member of the decedent's family." *Id.* § 2032A(b)(1).

The term "qualified heir" refers to the member of the decedent's family who inherits the decedent's property. *Id.* § 2032A(e)(1).[3] The statute further provides that, "[i]f a qualified heir disposes of any interest in qualified real property to any member of [her or] his family, such member shall thereafter be treated as the qualified heir with respect to such interest." *Id.*

"Qualified use" is defined as "the devotion of the property to ... use as a farm for farming purposes, or ... use in a trade or business other than the trade or business of farming." *Id.* § 2032A(b)(2). The House Report accompanying the 1976 legislation elaborates on the meaning of "qualified use." The Report emphasizes the need for an active farming or business use of the property. "The mere passive rental of property will not qualify." H.R.Rep. No. 1380 at 23, *reprinted in* 1976 U.S.C.C.A.N. at 2897, 3377. However, rentals where payment is contingent upon the farm's performance, such as a crop-share lease, are permissible according to the House Report. *Id.* ("[I]f A, the decedent, owned real property which he leased for use as a farm to the ABC partnership in which he and his sons B and C each had a *one-third interest in profits* and capital, the real property could qualify for special use valuation.") (emphasis added); *see also Martin v. Commissioner,* 783 F.2d 81, 83 (7th Cir.1986).

At the same time that Congress acted to afford special estate tax benefits to family farms, it sought to foreclose abuse of the privilege by taxpayers who would engage in family farming only long enough to reap the estate tax benefits and then would convert the property to a more lucrative commercial use. "[I]t would be a windfall to the beneficiaries of an estate," the House Report noted, "to allow real property used for farming or closely held business purposes to be valued for estate tax purposes at its farm or business value unless the

---

**1.** References are to the Internal Revenue Code of 1954, as amended.

**2.** The legislation also applies to certain closely-held businesses.

**3.** Only certain relatives qualify as a member of the decedent's family for purposes of the special use valuation. 26 U.S.C. § 2032A(e)(2).

beneficiaries continue to use the property for farm or business purposes, at least for a reasonable period of time after the decedent's death." H.R.Rep. No. 1380 at 22, *reprinted in* 1976 U.S.C.C.A.N. at 2897, 3376; *see also* S.Rep. No. 938, 94th Cong., 2d Sess. 15, *reprinted in* 1976 U.S.C.C.A.N. 2897, 4030, 4041. Consequently, Congress added the requirement that the property remain in the qualified use for ten years after the decedent's death. 26 U.S.C. § 2032A(c)(1).[4]

The statute imposes a "recapture tax" on qualified heirs who breach the conditions of the special use valuation:

> If, within 10 years after the decedent's death and before the death of the qualified heir—
>
> (A) the qualified heir disposes of any interest in qualified real property (other than by a disposition to a member of [her or] his family), or
>
> (B) the qualified heir ceases to use for the qualified use the qualified property which was acquired (or passed) from the decedent,
>
> then, there is hereby imposed an additional estate tax.

26 U.S.C. § 2032A(c)(1). The recapture tax is designed to recoup the special tax savings inappropriately enjoyed by the qualified heir when the heir elected the special use valuation. *See id.* § 2032A(c)(2); H.R.Rep. No. 1380 at 25–26, *reprinted in* 1976 U.S.C.C.A.N. at 2897, 3379–80.

Two amendments to the 1976 version of the family farm valuation provision are of special relevance to the present case. First, in 1981, Congress eased the terms by which a decedent's land could qualify in the first instance for special use valuation. As originally enacted, section 2032A required that the decedent personally have operated the farm prior to death. Recognizing that owners of farms often become ill or disabled during the closing years of their lives, Congress amended the statute to permit land to qualify if either the decedent or a member of her or his family farmed the property prior to the decedent's death. 26

U.S.C. § 2032A(b)(1); H. Conf. Rep. No. 215, 97th Cong. 1st Sess. 248, *reprinted in* 1981 U.S.C.C.A.N. 105, 285, 337; S.Rep. No. 144, 97th Cong., 1st Sess. 132–33, *reprinted in* 1981 U.S.C.C.A.N. 105, 233–34; *see also* Treas. Dec. 7786, 1981–2 Cum. Bull. 174 (amending Treas. Reg. 20.2032A–3(b)(1)). As a consequence of this amendment, net cash leases from the decedent to a member of the family no longer precluded the heirs from subsequently invoking the special use valuation provision. S.Rep. No. 144 at 133, *reprinted in* 1981 U.S.C.C.A.N. at 105, 233; H.R.Rep. No. 201, 97th Cong., 1st Sess. 169, *reprinted in* 1981–2 Cum. Bull. 352, 382.

Congress emphasized that the 1981 amendment "[did] not change the present requirement that the qualified heir owning the real property after the decedent's death use it in the qualified use throughout the recapture period." S.Rep. No. 144 at 134, *reprinted in* 1981 U.S.C.C.A.N. at 105, 234; H.R.Rep. No. 201 at 169, *reprinted in* 1981–2 Cum. Bull at 382.

The committee reports also reiterated the admonition that the qualified use be "an active trade or business use as opposed to a passive or investment use." S.Rep. No. 144 at 133, *reprinted in* 1981 U.S.C.C.A.N. at 105, 233; H.R.Rep. No. 201 at 169, *reprinted in* 1981–2 Cum. Bull. at 382.

The second significant amendment to the special use valuation provision came in 1988. Congress crafted a special rule for the surviving spouse of a decedent that permitted her or him to rent the property to a family member on a net cash basis without running afoul of the qualified use requirement. 26 U.S.C. § 2032A(b)(5). This change, the House Report noted, contrasted sharply with the prior rule that "[c]ash rental of specially valued property is not a qualified use and, therefore, is treated as a recapture event." H.R.Rep. No. 795, 100th Cong., 2d Sess. 590 (1988). The House Report revealed the impetus for the change:

> Under present law, property may qualify for special use valuation if the dece-

---

**4.** Originally, the qualified use requirement extended for fifteen years. *See* H.R.Rep. No. 1380 at 25, *reprinted in* 1976 U.S.C.C.A.N. at 2897, 3379.

dent leases the property to a member of his family. The recapture tax is imposed, however, if the property is not used in a qualified use by the qualified heir. Thus, if a decedent leases the qualified real property to a member of his family and the property passes to his spouse, a recapture tax will be imposed under present law unless the spouse begins to use the property in a qualified use.

The committee believes that the surviving spouse should not be subject to more onerous rules than the decedent. Moreover, imposing a recapture tax unless the surviving spouse uses the property in a qualified use interferes with the orderly operation of the farm. Accordingly, the committee believes that a surviving spouse's cash rent to a member of the spouse's family should not be a recapture event. This rule permits the surviving spouse to obtain a more certain income stream than would be provided by a crop share lease.

*Id.* at 590–91.

The effect of the 1981 and 1988 amendments, in sum, was to engraft on the special use valuation provision two specific exceptions where passive rental, as opposed to active farming, of property will be deemed consistent with the qualified use requirement.

### B. *Factual History*

Elizabeth Williamson owned real property in Chippewa County, Minnesota. Prior to Elizabeth Williamson's death, her grandson, Harvey Williamson, operated the property as a family farm under a crop share lease with Ms. Williamson.

When Ms. Williamson died in 1983, her son, the appellant Beryl Williamson, inherited the farm land. Williamson elected the special use valuation provision, 26 U.S.C. § 2032A, for purposes of calculating the estate tax. This reduced the base value of the farm from $225,247.50 to $94,209.60.

Williamson, who lives in San Diego, California, subsequently entered into a cash lease of the property, under which his nephew, Harvey Williamson, farmed the land. Under the agreement, Harvey Williamson promised to pay a fixed semi-annual rental fee of $4,297.50, due April 1st and October 1st of each year.

The Commissioner of Internal Revenue determined that the cash lease of the term failed to satisfy the special valuation provision's qualified use requirement. Consequently, the Commissioner issued a Notice of Deficiency to Beryl Williamson, asserting a $42,026 recapture tax.

Williamson petitioned the Tax Court for a redetermination of the deficiency. The parties agreed that the property originally qualified for special use valuation and that Beryl Williamson fit the statutory definition of a qualified heir. Williamson and the Commissioner parted company, however, over two issues of law. First, Williamson argued that the cash lease to his nephew did not constitute a cessation of qualified use within the meaning of 26 U.S.C. § 2032A(c)(1)(B). Second, Williamson contended that the lease represented a disposition of his interest in the property to his nephew, such that the nephew became the qualified heir. Under this theory, the nephew's ongoing farming activities continued to qualify the property for special use valuation, pursuant to 26 U.S.C. § 2032A(e)(1).

The Tax Court rejected both of Williamson's arguments and entered judgment for the Commissioner. Williamson timely noticed his appeal to this court. 26 U.S.C. § 7483; Fed.R.App.P. 13(a). We affirm.

## DISCUSSION

### A. *Standard of Review*

■ Whether the Tax Court erred in interpreting section 2032A's "qualified use" requirement is a question of statutory construction we review de novo. *See Home Sav. Bank, F.S.B. v. Gillam*, 952 F.2d 1152, 1156 (9th Cir.1991); *Estate of Schnack v. Commissioner*, 848 F.2d 933, 935 (9th Cir.1988).

### B. *Cessation of Qualified Use*

Williamson argues that the cash lease to his nephew constitutes a qualified use of

the property because a family member continues to farm the land. Section 2032A's purpose to perpetuate the family farm, Williamson continues, has thus been fulfilled in this case. Williamson stresses that the statutory definition of a cessation of qualified use focuses solely on the use to which the property is put and does not specifically designate who must be using the property in the qualified use. 26 U.S.C. § 2032A(c)(6)(A).

The Tax Court disagreed with Williamson, pointing out that the statute expressly provides for the triggering of the recapture tax when "the qualified heir ceases to use for the qualified use the qualified property." *Id.* § 2032A(c)(1)(B). The Tax Court also noted that Williamson's position conflicted with the legislative history's repeated proscriptions against passive rentals. Lastly, the Tax Court explained that Williamson's reading of the statute would render the 1981 and 1988 amendments redundant.

■ We agree with the Tax Court that Williamson's proposed interpretation of section 2032A is untenable. Our starting point in the task of statutory construction is, of course, the statute's plain language. *S & M Inv. Co. v. Tahoe Regional Planning Agency,* 911 F.2d 324, 326 (9th Cir. 1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 963, 112 L.Ed.2d 1050 (1991). In this case, the plain language of the recapture provision disproves Williamson's suggestion that farming by someone other than the qualified heir preserves the special use valuation. Section 2032A(c)(1)(B) expressly states that the recapture tax is activated when "the *qualified heir* ceases to use for the qualified use the qualified property." (Emphasis added.) Putting aside for the time being Williamson's disposition argument, Beryl Williamson, not Harvey Williamson, is the qualified heir to Elizabeth Williamson. And Williamson admits that

he has not personally used the property for farming.[5]

Williamson counters by pointing out that the plain language of the "cessation of qualified use" provision does not limit its application to the qualified heir. *See* 26 U.S.C. § 2032A(c)(6)(A). Williamson's argument, however, misunderstands subsection (c)(6)(A). This subsection reads:

> For purposes of paragraph (1)(B), real property shall cease to be used for the qualified use if ... such property ceases to be used for the qualified use set forth in subparagraph (A) or (B) of subsection (b)(2) [that is, for farming or a trade or business], under which the property qualified....

By its language, subsection (c)(6)(A) does not stand alone in defining a cessation of qualified use. It specifically refers and incorporates into its definition subsection (c)(1)(B), the provision that requires the qualified heir to undertake the qualified use. Contrary to Williamson's assertion, then, subsection (c)(6)(A) neither modifies nor operates independently of subsection (c)(1)(B). Rather, subsection (c)(6)(A) simply clarifies that portion of the statutory language imposing on Williamson, the qualified heir, the obligation personally to conduct a qualified use of the property.

The plain language of the statute further counsels against Williamson's position because it reveals that, when Congress wanted to include family members in addition to the qualified heir in the statute's provisions, it expressly stated so. For example, while Congress couched the qualified use requirement in terms solely of the heir's activities, the provision's material participation requirement can be satisfied by the "qualified heir or any member of [her or] his family." *Compare* 26 U.S.C. § 2032A(c)(1)(B) *with* 26 U.S.C. § 2032A(c)(6)(B)(ii).

More particularly, the plain language of the statute demonstrates that, when Con-

---

**5.** Williamson would be considered to be personally engaged in the business of farming if he either actively farmed the land himself or entered into a crop-share (as opposed to cash) lease with a person actually farming the land. Under both scenarios, Williamson would con-

front the business risks and vicissitudes of family farming. *See* H.R.Rep. No. 1380 at 23, *reprinted in* 1976 U.S.C.C.A.N. at 2897, 3377; *see also Martin v. Commissioner,* 783 F.2d 81, 83 (7th Cir.1986).

gress intended for intra-family cash leases of the property to satisfy the qualified use requirement, it knew how to say so. In 1988, Congress added language to the special use valuation provision providing that "[a] surviving spouse shall not be treated as failing to use such property in a qualified use solely because *such spouse rents such property to a member of such spouse's family on a net cash basis.*" 26 U.S.C. § 2032A(b)(5)(A) (emphasis added). Indeed, Congress's denomination of this subsection as a "special rule[ ]" indicates that the absence of language in the provision authorizing other intra-family net cash leases reflects deliberate congressional line-drawing, rather than mere legislative oversight.

■ When, as here, the plain language of a statute appears to resolve a dispute, we consider the legislative history "to determine only whether there is 'clearly expressed legislative intention contrary to that language.'" *S & M Inv.*, 911 F.2d at 327 (quoting *Immigration & Naturalization Serv. v. Cardoza–Fonseca*, 480 U.S. 421, 432 n. 12, 107 S.Ct. 1207, 1213 n. 12, 94 L.Ed.2d 434 (1987)) (additional internal quotation omitted).

■ The legislative history accompanying section 2032A and its amendments reconfirms the statute's plain language insisting that Williamson as the qualified heir must personally use the property in its qualified use. Cash rental to a relative will not suffice. Committee reports repeatedly warn, in no uncertain terms, that the passive rental of property does not satisfy the qualified use requirement. *See, e.g.*, H.R.Rep. No. 1380 at 23, *reprinted in* 1976 U.S.C.C.A.N. at 2897, 3377 ("The mere passive rental of property will not qualify."); S.Rep. No. 144 at 133, *reprinted in* 1981 U.S.C.C.A.N. at 105, 233 ("[A] qualified use [must] be an active trade or business use as opposed to a passive, or investment, use."); H.R.Rep. No. 201 at 169, *reprinted in* 1981–2 Cum. Bull. at 382 (same as S.Rep. No. 144); H.R.Rep. No. 795 at 590 ("Cash rental of specially valued property is not a qualified use and, therefore, is treated as a recapture event.").

Williamson's reading of section 2032A, moreover, would render the 1981 and 1988 amendments meaningless surplusage. If section 2032A already considered intra-family cash leases to satisfy the qualified use requirement, then Congress's labors, in 1981 and 1988, to make cash leases by decedent's and their surviving spouses "qualified uses" were mere exercises in redundancy. Under Williamson's theory, there simply was no need for the 1988 amendment. We are not at liberty to impose upon a statute a construction that renders parts of its language nugatory. *See United States v. Mehrmanesh,* 689 F.2d 822, 829 (9th Cir.1982).

Williamson suggests that the 1981 and 1988 amendments simply clarified the original intent of Congress that intra-family cash rentals constitute a qualified use. Williamson's position, however, cannot survive a reading of the legislative history accompanying the amendments.

In 1981, Congress added language providing that property would still be eligible for special use valuation where the decedent had cash leased the land to a family member. 26 U.S.C. § 2032A(b)(1). The Senate report accompanying the amendment specifically labelled the expansion of eligibility a change: "These *changes* generally expand availability of current use valuation to estates *not eligible under present law.*" S.Rep. No. 144 at 133, *reprinted in* 1981 U.S.C.C.A.N. at 105, 233 (emphasis added). Congress thus legislated from the viewpoint that intra-family leases did not otherwise satisfy the qualified use criterion. *See Martin v. Commissioner,* 783 F.2d 81, 83 (7th Cir.1986) ("[T]he qualified use must be active rather than passive; for, if passive were good enough, there would have been no reason to amend the statute to make clear that the decedent himself did not have to be working the farm at the time of his death."); *see also Schuneman v. United States,* 783 F.2d 694, 698 n. 2 (7th Cir.1986).

Similarly, Congress's 1988 liberalization of the qualified use requirement for surviving spouses worked a change in the law. The House report noted that, "[u]nder pres-

ent law, ... if a decedent leases the qualified real property to a member of [her or] his family and the property passes to [the] spouse, a recapture tax will be imposed under present law *unless the spouse begins to use the property* in a qualified use." H.R.Rep. No. 795 at 590. Amendment was necessary to effectuate Congress's belief that "a surviving spouse's cash rent to a member of the spouse's family should not be a recapture event." *Id.* The Committee's call for change rings empty if one accepts Williamson's suggestion that the law already permitted such cash rentals.

Congress carefully tailored its 1981 and 1988 amendments to benefit the decedent and the decedent's spouse only. Williamson's capacious interpretation of the amendments as clarifying the propriety of all intra-family cash leases cannot be reconciled with the straitened and narrowly targeted relief actually enacted by Congress. If Congress intended to authorize a larger class of intra-family cash leases, it should have said so. Unless and until Congress amends the statute, we must decline Williamson's invitation to apply broadly that which Congress has written sparingly.[6]

Numerous courts, we note, have confirmed that passive rentals fail the qualified use test. In *Martin*, the Seventh Circuit held that a cash lease by a qualified heir to a non-family member did not amount to a qualified use, regardless of the fact that the lessee farmed the land. In words that speak directly to Williamson's contention, the Seventh Circuit refused to focus solely on the use to which the land was being put:

> We are asked to infer that all that is required to avoid recapture is that the

property continue in a qualified use; the use need not be by the heir. But this interpretation is almost certainly wrong.

783 F.2d at 83. The court elaborated:

> When the estate tax return was filed, the heirs were operating the farm through a sharecropping arrangement with one of them; that was the qualifying use and it ceased when the farm was let at a fixed rental. The House Report minces no words: "The mere passive rental of property will not qualify."

*Id.* (quoting H.R.Rep. No. 1380 at 23, *reprinted in* 1976 U.S.C.C.A.N. at 2897, 3377); *see also Brockman v. Commissioner,* 903 F.2d 518, 521 (7th Cir.1990); *Heffley v. Commissioner,* 884 F.2d 279, 284 (7th Cir.1989) ("Rentiers-heirs (i.e., heirs receiving a fixed income from their investment) forfeit the exceptionally favorable tax treatment that the statute [section 2032A] affords to those meeting its exacting requirements.... Rentiers forego the friendly tax treatment accorded to those meeting the demanding statutory requirements. There is no qualified use during the lease of a farm under a fixed-rental agreement."); *Estate of Sherrod v. Commissioner,* 774 F.2d 1057, 1064 (11th Cir. 1985), *cert. denied,* 479 U.S. 814, 107 S.Ct. 66, 93 L.Ed.2d 24 (1986).

■ Williamson calls upon this court to consider the policies animating section 2032A and to interpret the statute to effectuate those ends. Congress's avowed purpose for enacting the special use valuation, Williamson notes, was to preserve the family farm. Williamson insists that his actions are fully consistent with that goal. By leasing to his nephew, Williamson has con-

---

**6.** As a last resort, Williamson calls our attention to a 1981 amendment to Treasury Regulation 20.2032A–3(b)(1), which recognized that a cash rental by a decedent to a family member constituted a qualified use. *See* Treas. Dec. 7786, 1981–2 Cum. Bull. 174. Williamson argues that, because this change was proposed before Congress amended section 2032A to permit predeath cash leases, the Commissioner must have considered intra-family cash leases appropriate under the 1976 version of section 2032A. The Commissioner responds that the amendment was prompted solely by the legislation pending

in Congress and notes that the change in the regulation did not take effect until after Congress amended the statute. *Cf.* Treas.Reg. § 20.-2032A–3(a) (1980), *reprinted in* 1980–2 Cum. Bull. 258. Even were we inclined to accept Williamson's rather strained surmise concerning the impetus for the regulation's amendment, we would nevertheless find a single Treasury Regulation insufficient to overcome the plain language of the statute and the weighty legislative history aligned against permitting intra-family cash rentals.

tinued the use of his mother's land as a farm.

The difficulty with Williamson's position is twofold. First, the tax legislative process necessarily entails line-drawing. While Congress's purpose in enacting section 2032A was no doubt beneficial, that same Congress intentionally chose to circumscribe narrowly the availability of the tax benefit in the face of a competing concern for maximizing tax revenues. We must accord deference to the balance struck by Congress. *See Heffley,* 884 F.2d at 283 ("While Congress will allow certain exceptional preferences to avoid excessive tax burdens under certain conditions, in order to achieve the congressional intent these exceptions must be narrowly applied and the corresponding exclusions broadly interpreted."); *see also Corn Prods. Ref. Co. v. Commissioner,* 350 U.S. 46, 52, 76 S.Ct. 20, 24, 100 L.Ed. 29 (1955); *Estate of Thompson v. Commissioner,* 864 F.2d 1128, 1136 (4th Cir.1989). Congress thus chose not to make the special use valuation available to all family farms, presumably because to do so would have imposed too heavy a burden on the public fisc. Congress has drawn a line, permitting cash leases by some family members and not by others. To the extent Williamson argues that this line seems arbitrary and could just as easily have been drawn to encompass his situation, he is preaching to the converted. That we might disagree with a legislative distinction Congress has made, however, does not empower us to rewrite the statute. Our task "is to apply the [statute's] text, not to improve upon it." *Pavelic & LeFlore v. Marvel Entertainment Group,* 493 U.S. 120, 126, 110 S.Ct. 456, 460, 107 L.Ed.2d 438 (1989); *see also Badaracco v. Commissioner,* 464 U.S. 386, 398, 104 S.Ct. 756, 764, 78 L.Ed.2d 549 (1984) ("Courts are not authorized to rewrite a statute because they might deem its effects susceptible of improvement."); *Estate of Cowser v. Commissioner,* 736 F.2d 1168, 1171 (7th Cir.1984) ("We may not agree with where the line is drawn, but we are not in a position to move it. We may only interpret and enforce the laws Congress gives us; we may not rewrite or amend them as we see fit.").

Furthermore, the distinction made by Congress in this case is not as arbitrary as Williamson portrays it. Section 2032A's conceded purpose is to protect and insulate the family farmer from excessive estate taxes. Yet the person seeking section 2032A's shelter here is not engaged in family farming. The family farmer here is the nephew, a person not receiving any of section 2032A's benefits. Williamson's relationship to the land is that of a landlord and passive investor. Congress never intended such persons to reap the benefits of section 2032A. *Cf. Estate of Abell v. Commissioner,* 83 T.C. 696, 701 (1984).

Section 2032A's tax benefits serve as a carrot enticing and rewarding qualified heirs for accepting the financial risks of family farming. *See Brockman,* 903 F.2d at 523 ("The qualified use requirement ... focuses on whether the decedent or the decedent's family incur the risks of farming."). Placing Williamson within section 2032A would effectively let him have his cake and eat it too. He would enjoy the special tax benefits of section 2032A without incurring any of family farming's concomitant costs or risks. Again, the nephew bears those. Other courts have insisted that section 2032A is a two-way street and have withheld its benefits when the qualified heir insulates herself or himself from financial risk through a fixed cash rental scheme. *Id.* at 526 ("In this case, whether the livestock operation flourished or was wiped out by drought or disease, whether cattle prices rose or fell, whether in short, Dickison's activities were profitable or unprofitable, Donahoe's rental income was unaffected."); *Heffley,* 884 F.2d at 284 ("Whether farm prices fluctuated or crops flourished or died their rental income would be unaffected because those heirs were rentiers throughout the lease, not farmers who risked the variables of weather and market price."); *Martin,* 783 F.2d at 84 ("Whether farm prices rose or fell, whether the crops planted on the farm flourished or were wiped out by cold weather or disease, whether in short the farm was productive or unproductive, prof-

itable or unprofitable, the taxpayers' rental income would be unaffected. They were thus out of the farming business, and outside the scope of [section 2032A]."). Strong policy reasons thus exist for not extending section 2032A in the manner advocated by Williamson.

Finally, much of the emotive force behind Williamson's position is attributable to the feeling one gets, upon first look, that the IRS is making a hypertechnical distinction. The same family member farmed the land before Ms. Williamson's death and after. On the surface, nothing seems to have changed to justify the alteration in tax treatment. But upon closer examination, it becomes apparent that things have changed. Prior to Ms. Williamson's death, Harvey Williamson farmed under a crop-share rental agreement. The owner of the land thus still faced the risks of farming. After Ms. Williamson's death, the owner of the land (Beryl Williamson) is receiving a fixed cash rental for the land. The owner and person seeking to enjoy the preferential tax treatment afforded by § 2032A thus faces none of the risks of farming and, in fact, is not himself a family farmer. A sound rationale thus supports the IRS's distinction for tax purposes between the pre- and post-death uses of the Williamson property. *Cf. Estate of Trueman v. United States*, 6 Cl.Ct. 380, 1984–2 U.S. Tax Cas. (CCH) ¶ 13,590, at 86,180 (1984) ("Where the use made by a decedent of his property was an investment use, no hardship to decedent's heirs results from forcing them to sell the property in order to realize its full potential value as an investment. Investment properties, such as those held by the decedent, are fungible. The decedent's family rental business is not destroyed by forcing his heirs to exchange old rental properties for new ones.").

In sum, section 2032A's plain language, amendments, legislative history, and policies all support the Commissioner's determination that Williamson's cash lease of the farm to his nephew constituted a cessation of qualified use, triggering the recapture tax.

### C. *Disposition of the Property*

■ Williamson argues alternatively that, when he leased the property to his nephew, Harvey Williamson, Harvey stepped into Beryl's shoes and became the new qualified heir of the property. Harvey's farming of the land, Williamson urges, therefore satisfies the statutory requirement that a qualified heir actively farm the property.

The Tax Court found Williamson's contention unavailing. The Tax Court reasoned that a lease was not the type of disposition that Congress intended to effect a change in the qualified heir.

We join the Tax Court in rejecting Williamson's argument. Section 2032A(e)(1) provides:

> If a qualified heir disposes of any interest in qualified real property to any member of [her or] his family, such member shall thereafter be treated as the qualified heir with respect to such interest.

Williamson insists that the phrase "of any interest" necessarily encompasses a leasehold interest. In so arguing, however, Williamson ignores the preceding condition that the interest be "dispose[d] of." The import of the word "dispose" is a permanent loss or renunciation of an interest. A lease, by contrast, entails only the temporary transfer of a property interest.

While not speaking directly to the issue, the legislative history accompanying the recapture tax provision uses the word "dispose" in conjunction only with permanent losses or transfers of an interest in the qualified property.

> Since a *sale, exchange, or other disposition (such as a gift)* by one qualified heir to another qualified heir is not treated as a recapture event, the bill provides that the second qualified heir is to be treated as if he had *received* the property from the decedent. Thus, the second qualified heir steps into the shoes of the first heir and becomes liable for the recapture tax....

H.R.Rep. No. 1380 at 26, *reprinted in* 1976 U.S.C.C.A.N. at 2897, 3380; *see also id.*, H.R.Rep. No. 1380 at 25, 1976 U.S.C.C.A.N.

at 3379 (disposition discussed in the context of a sale, involuntary conversion, rollover, or similar transaction).

That the recipient of the disposed interest assumes liability for the recapture tax further indicates that a disposition occurs only when a transfer of legal responsibility for the interest is fully accomplished. Because leases generally transfer only partial legal rights to a lessee, treating a lease as a disposition would create a legal limbo where the lessee and lessor share the responsibilities of a qualified heir. Nothing in the statute's language or legislative history suggests that Congress envisioned or intended such a result. Similarly, the Treasury Regulation requiring persons with certain interests in qualified property to enter into an agreement to pay the recapture tax, should the qualified use cease, contains no indication that legal responsibility attaches to a leasehold interest. *See* 26 C.F.R. § 20.2032A–8(c)(2).

Moreover, Williamson's suggestion that a lease constitutes a disposition inaugurating a new qualified heir, like his qualified use argument, renders superfluous Congress's 1988 amendment authorizing cash leases by surviving spouses. 26 U.S.C. § 2032A(b)(5)(A). If an intra-family cash lease already accomplished a change in the qualified heir pursuant to section 2032A(e)(1), Congress would have had no need to act to protect surviving spouses. Spouses' cash leases to family members would have continued the qualified use simply by changing the qualified heir. Congress thus legislated in 1988 from the viewpoint that cash leases did not constitute dispositions already protected from the recapture tax by subsection (e)(1). Indeed, implicit in the 1988 amendment is the conclusion that the lessor/surviving spouse remains the qualified heir despite the transfer of a leasehold interest to another family member.

Williamson responds by citing a portion of the 1976 report of the Joint Committee on Taxation, which reads:

The "cessation of qualified use" *which constitutes a disposition* occurs if (1) the qualified property ceases to be used

for the qualified use under which the property qualified for special use valuation. . . .

Staff of Joint Committee on Taxation Report, 94th Cong., 2d Sess. 542 (1976) (emphasis added). Williamson contends that this language equates a cessation of qualified use with a disposition under subsection (e)(1).

■ We find this argument untenable. The Committee's language does not suggest that all cessations of qualified use constitute a disposition. Nor is Williamson's interpretation of the Committee's language consistent with the statute's plain terms. Section 2032A provides for two distinct events to trigger the recapture tax—either the disposition of the property to a non-family member, 26 U.S.C. § 2032(c)(1)(A), *or* the cessation of qualified use, *Id.* § 2032A(c)(1)(B). If Congress intended to treat dispositions and cessations of qualified use synonymously, it would not have written section 2032A(c)(1) in the disjunctive.

Williamson also argues that the Commissioner's and Tax Court's interpretation of "dispose" in his case is inconsistent with the position taken by the Commissioner in a Technical Advice Memorandum. In Technical Advice Memorandum 8731001 (March 19, 1987), the Commissioner stated that the grant of an easement was a disposition. Williamson argues that no reasonable distinction can be made between leaseholds and easements for purposes of defining a disposition under section 2032A.

We disagree. In fact, contrary to Williamson's position, Technical Advice Memorandum 8731001 actually strengthens the Commissioners' position. Generally, the grant of an easement, unlike a leasehold, permanently conveys a property interest to another person. The grantor retains no supervisory regulatory control over the property interest conveyed by the easement. *See* R. Cunningham, W. Stoebuck, D. Whitman, *The Law of Property* § 8.1 (1984). The Commissioner's conclusion in Technical Advice Memorandum 8731001 thus reinforces our holding that a section 2032A disposition occurs when an interest

has been permanently, not temporarily, surrendered by the qualified heir.[7]

In sum, Williamson cannot salvage the special use valuation for his property on the ground that he "dispose[d] of" an interest to his nephew, making his nephew the new qualified heir. Such a short-term transfer of a limited property interest does not amount to a disposition, within the meaning of section 2032A(e)(1).

## CONCLUSION

We affirm the decision of the Tax Court denying Williamson's petition for relief and affirming the Commissioner's Notice of Deficiency. Williamson's cash lease of the farm to his nephew constituted a cessation of the qualified use because Williamson, the qualified heir, used the land for passive rental activity instead of an active farming business. Williamson's grant of a leasehold interest to his nephew, moreover, did not effect a disposition under section 2032A(e)(1). Williamson remains the qualified heir.

AFFIRMED.

REINHARDT, Circuit Judge, dissenting:

This is a difficult case. Tax statutes are notoriously complex, a fact that makes tax lawyers wealthy and the resolution of appeals of taxation issues exceptionally difficult. The quandary in which we find ourselves today is also at least partially the result of the fact that, as my colleagues acknowledge, the rules that govern such matters are often arbitrary and make little sense as applied to particular "cases and controversies".

Harvey Williamson farmed the land at issue here prior to the death of Elizabeth Williamson, his grandmother. Upon her death, he continued to farm the land, although the land was now owned by Beryl Williamson, Elizabeth's son and Harvey's uncle. The same person farmed the land— and it remained a "family farm"—both before and after Elizabeth's death. The "spe-cial use valuation" was enacted by Congress during our nation's Bicentennial in order to keep the family farm, an all-too-rapidly-vanishing remnant of our nation's rural past, alive and well in our complex modern economy. My colleagues now hold that this provision protects Harvey's use of the land only while it is owned by his grandmother, not while it is owned by his grandmother's son, Harvey's uncle. My colleagues reach the result they believe is compelled by the provisions of a cumbersome tax statute; they do not defend the rationality of that result. I cannot quarrel with my colleague's good faith or sincerity: their exhaustive research and detailed analysis of this complex matter of law is readily apparent. The fault lies in Congressional draftsmanship, not in judicial reasoning. The conclusion my colleagues reach is a defensible one given the hodge-podge statutory structure and the type of analysis we are required to perform. I believe, however, that there is a different and preferable conclusion that we can and should reach— one that is more plausible and more in accord with both the statutory language and purpose. Accordingly, and with deference, I dissent.

The resolution of the issue of first impression that we have the dubious privilege of adjudicating requires us to track the convoluted language of 26 U.S.C. § 2032A—a statute that contains virtually innumerable subparts (including, among others, the almost indecipherable § 2032A(c)(2)(E)(ii)(II) and § 2032A(e)(7)(B)(ii)(I)), and that comprises a full nine pages of *exceptionally* small text in the supplement to the United States Code Annotated. *See* 26 U.S.C. § 2032A (West Supp.1992). Fortunately, Congress has wisely seen fit to engage in almost no discussion or debate over the relevant portions of that statute such as would ordinarily form the basis for its "legislative history"; instead, we are left to glean what we can in that department solely from the sage advice of the staffers who have creat-

---

7. We note in passing that Technical Advice Memorandum 8731001 has no binding or precedential force on the Commissioner in this case.

*See Norman Corp. v. District Director of Internal Revenue,* 446 F.2d 1374, 1375 (9th Cir.1971).

ed the legislative reports regarding its enactment. *See generally* 1976 U.S.C.C.A.N. 2897, 2897–4284 (indicating that the *selected* legislative history of the Tax Reform Act of 1976, of which § 2032A was a part, comprises over 1300 pages of text of, of course, excruciatingly small print).

Despite the Herculean nature of our task, the plain language of the statute is revealing, and in the end, after extensive analysis, may be seen to conflict squarely with the seemingly reasonable interpretation given it by the majority. The first step in our analytical process is to determine whether the land in question qualified for special use valuation under § 2032A as of the time of Elizabeth Williamson's death. To so qualify, the Williamson's farm must have been "real property located in the United States which was acquired from or passed from the decedent to a qualified heir of the decedent and which, on the date of the decedent's death, was being used for a qualified use by the decedent or a member of the decedent's family...." 26 U.S.C. § 2032A(b)(1).

It helps to take that sentence in parts. First, the Williamson's farm was and is real property located in the United States.

Second, the farm passed from Elizabeth Williamson, the decedent, to Beryl Williamson.

Third, Beryl was and is a qualified heir of Elizabeth. Section 2032A(e)(1) defines a "qualified heir" as "a member of the decedent's family". Section 2032A(e)(2) defines a "member of the family" as including, among others, "an ancestor of such individual ... [or] a lineal descendant of such

individual." Beryl is therefore a "qualified heir" because he is Elizabeth's son.

Fourth, on the date of the decedent's (Elizabeth's) death, the Williamson's property was being used for a qualified use by a member of the decedent's family.[1] On the date of Elizabeth's death, the property was being used by Harvey Williamson as a farm: that use clearly is a "qualified use", as § 2032A(b)(2) defines "qualified use" as (among other things) "the devotion of the property to ... use as a farm for farming purposes." Harvey is a "member of [Elizabeth's] family": he is her grandson, and § 2032A(e)(2)'s definition of "member of the family" includes "a lineal descendant" of Elizabeth. Hence, on the date of Elizabeth's death, the farm was being used for a qualified use by a member of the decedent's family.[2]

Put together, the Williamson's property was "real property located in the United States which was acquired from or passed from the decedent to a qualified heir of the decedent and which, on the date of the decedents death, was being used for a qualified use by the decedent or a member of the decedent's family" as required by 28 U.S.C. § 2032A(b)(1). No other section of § 2032A is relevant to this conclusion: not the rest of § 2032A(b)(1),[3] not § 2032A(c) ("Tax treatment of dispositions and failures to use for qualified use"),[4] not even the exotic § 2032A(e)(13) ("Special rules for woodlands"). Accordingly, when the land passed from Elizabeth to her son Beryl (the "qualified heir"), it was "qualified real property" and thus entitled to the benefit of the special use valuation provided by § 2032A—even though (or perhaps *be-*

---

1. *See also infra* at 1537 n. 2.

2. It may also be true that, at the time of her death, "the decedent" (Elizabeth) was using the farm "for a qualified use", as she had entered into a crop-share agreement with Harvey, who was farming the land, and § 2032A(b)(2) requires only that the property be utilized in *some* economic capacity (as opposed to a residence or fallow land). *See* 26 U.S.C. § 2032A(b)(2) ("For purposes of this section, the term 'qualified use' means the devotion of the property to any of the following: (A) use as a farm for farming purposes, or (B) use in a trade or business other than the trade or business of farming."). How-

ever, I need not rely on that interpretation—however reasonable—and hence I choose not to unnecessarily complicate matters that are complicated enough already.

3. Sections 2032A(b)(1)(A), (B), and (C) require that the qualified use "by a decedent or a member of the decedent's family" have persisted for a specific period of time prior to the decedent's death and that a certain percentage of the property have been used for that qualified use. It is clear, and my colleagues do not dispute, that those requirements were met here.

4. *See infra* at 1538–40.

*cause*) it was actually farmed by Harvey (Elizabeth's son and Beryl's nephew) at all times.

Given the above, it would be surprising indeed if the property nevertheless became subject to the "recapture tax" provided by that section while Harvey continued to farm the land. After all, nothing of any significance changed: the property was "qualified real property" under § 2032A(b) when Elizabeth owned it as well as when Beryl owned it, Beryl was a qualified heir, and both the actual use and the actual user of the property remained the same at all times.[5] Contrary to the conclusion reached by my colleagues, I believe that the clear language of § 2032A necessitates a holding that the property is *not* subject to the recapture tax so long as Beryl owns it and Harvey continues to farm the land.

The "recapture tax" is imposed by § 2032A(c)(1). That provision states, in relevant part, that the tax is imposed:

(1) If, within 10 years after the decedent's death and before the death of the qualified heir—

(A) the qualified heir disposes of any interest in qualified real property (other than by disposition to a member of his family), or

(B) the qualified heir ceases to use for the qualified use the qualified real property which was acquired (or passed) from the decedent....

The majority and the Tax Court believe that the imposition of a recapture tax is required by subsection (1)(B).[6] The crucial question, then, is this: for purposes of subsection (1)(B), what constitutes the "qualified heir ceas[ing] to use [the property] for the qualified use"?

Section § 2032A(c)(6) explicitly answers that precise question. I note first, should there be any doubt, that subsection (1)(B) applies exclusively to a *qualified heir's* cessation of use of qualified property. No other person's cessation of use of property is defined by that section. Therefore, a definition of what constitutes a cessation of use for purposes of subsection (1)(B) is necessarily a definition of when a *qualified heir* ceases to use qualified property for a qualified use. That definition is set forth in section 2032A(c)(6).[7] Under that section, the answer to what constitute's a *qualified heir's* cessation of qualified use is as follows:

For purposes of paragraph (1)(B) real property shall cease to be used for the qualified use if—

(A) such property ceases to be used for the qualified use set forth in subparagraph (A) or (B) of subsection (b)(2) under which the property qualified under subsection (b), or

(B) during any period of 8 years ending after the date of the decedent's death and before the date of the death of the qualified heir, there had been periods aggregating more than 3 years in which—

(i) in the case of periods during which the property was held by the decedent, there was no material participation by the decedent or any member of his family in the operation of the farm or other business, and

(ii) in the case of periods during which the property was held by any qualified heir, there was no material participation by such qualified heir or any member of his family in the operation of the farm or other business.

---

**5.** The majority relies heavily on a change from a crop-share lease to a cash lease. However, as I will explain later, that change is of no consequence for purposes of § 2032A(c)(1)(B), the controlling provision in this case. *See infra* at 1540–43.

**6.** Subsection (A) provides no basis for the imposition of a recapture tax here because even if a disposition of the property occurred, it was disposed of to a family member; such dispositions are explicitly exempted in subsection (A). Nei-

ther the majority nor the Tax Court could or does argue to the contrary.

**7.** In other words, the cessation of qualified use described in subsection (c)(6) can *only* occur as it relates to the qualified heir. In addition, the fact that subpart (B)(ii) of subsection (c)(6) explicitly discusses cessation of material participation by the *qualified heir* further strengthens the conclusion that subsection (c)(1) is satisfied when and only when the conditions in subsection (c)(6) are met.

In other words, a qualified heir (here, Beryl) does not cease to use the real property for a qualified used *unless* one of the two provisions of subsection (c)(6) is applicable.

The final step in our analysis, then, is to determine whether Beryl ceased to use the qualified property for a qualified use under any of the tests set forth in subpart (A) or (B) of subsection (c)(6). The answer to that question seems reasonably evident. Under subpart (A) of subsection (c)(6), the property in question *continued* to be used "as a farm for farming purposes", the qualified use for which it initially qualified at the time of Elizabeth's death. Hence, the property never "cease[d] to be used for the qualified use set forth in subparagraph (A) or (B) of subsection (b)(2)." Thus, subpart (A) of subsection (c)(6) does not apply and cannot serve as the basis for a determination that Beryl ceased to use the qualified property for a qualified use.

Similarly, there was clearly no cessation of use for a qualified use under subpart (B); indeed, *neither* subparagraph (i) *nor* subparagraph (ii) of that subpart is even remotely applicable. These subsections provide that a cessation of qualified use occurs when there is no longer any material participation in the farming by the heir (or decedent) *or any member of his or her family.* Here, at *all* relevant times, Harvey operated the farm. That, beyond question, is "material participation,"[8]—and it is material participation by a member of the family. To be absolutely clear, for purposes of subpart (B)(i), during the *entire* relevant period in which the Williamson property was owned by Elizabeth, Harvey farmed the land. Thus, there was material participation in the operation of the farm by Harvey, who was "the decedent or *any member of his [Elizabeth's]* family." Similarly, for purposes of subpart (B)(ii), during the *entire* relevant period in which the Williamson property was owned by Beryl, Harvey farmed the land. Thus, there was material participation in the operation of the farm by Harvey, who was "such qualified heir *or any member of his family.*"[9] Thus, as 26 U.S.C. § 2032A(c)(6) makes unambiguously clear, Harvey's continued operation of the farm for farming purposes precludes any determination that there was a cessation of use by the qualified heir (Beryl) under 26 U.S.C. § 2032A(c)(1)(B). Hence, neither subsection (c)(1)(A) nor (c)(1)(B) is applicable, and no recapture tax may be imposed.[10]

**8.** "Material participation" is determined for purposes of § 2032A "in a manner similar to the manner used for purposes of paragraph (1) of section 1402(A) (relating to net earnings from self-employment)." 26 U.S.C. § 2032A(e)(6). There is no question—and no party here disputes—that Harvey's active, personal farming of the property constituted "material participation" as that term is used in § 2032A.

**9.** In the context of subparagraph (e)(6), it appears that the reference to "his family" in subpart (B)(ii) may have been intended to mean the same thing that the reference to "his family" in subpart (B)(i); i.e., the *decedent's* family. Intentionally or not, however, subpart (B)(ii) contains the terms "such qualified heir" immediately before "any member of his family": grammatically, "his family" therefore refers to the family of the *qualified heir.*

Fortunately, however one interprets the reference to "his family" in subpart (B)(ii)—as either *Elizabeth's* family or *Beryl's* family—it is clear that Harvey qualifies, as he is a member of *both* Elizabeth *and* Beryl's family. He is Elizabeth's grandson: he therefore is a member of her family. *See* 26 U.S.C. § 2032A(e)(2) ("The term 'member of the family' [includes], with respect

to any individual, ... a lineal descendant of such individual."). Harvey is also Beryl's nephew—his mother's grandson. He therefore is a member of Beryl's family because § 2032A(e)(2) provides that "[t]he term 'member of the family' [includes], with respect to any individual, ... a lineal descendant ... of a parent of such individual." Stunningly, the definition of "one's family" in subsection (e)(2) comports with common notions what "one's family" contains—generally, grandmothers, uncles, grandsons, and nephews are included.

**10.** Contrary to my colleague's suggestion, subsection (c)(6)(A) does *not* "incorporate into its definition subsection (c)(1)(B)." Opinion at 11. To the contrary, the former explicitly *defines* the latter, not the other way around. *See* 26 U.S.C. § 2032A(c)(6) ("*For purposes of paragraph [ (c) ](1)(B),* real property shall cease to be used for the qualified use if...."). To say, as the majority does, that subsection (c)(6) does not "modify" subsection (c)(1), *see* Opinion at 1530, is—with all due respect—to misstate the question and guarantee an incorrect answer to the underlying issue. It is evident what subsection (c)(6) does with respect to subsection (c)(1). If defines, explains, and limits it: nothing more, nothing less.

As I see it, the language of the statute—although difficult to follow—is, upon proper analysis, ultimately clear, and properly resolves this appeal. The text of § 2032A, when all of its sub-parts are read together and in light of each other, establishes a rational statutory scheme and the application of that scheme here achieves a result that best effectuates the purposes of the statute and is fully consonant with the Congressional objectives. Under such circumstances, we need go no further in order to resolve the appeal. *See United States v. Ron Pair Enterprises,* 489 U.S. 235, 240–42, 109 S.Ct. 1026, 1029–31, 103 L.Ed.2d 290 (1989) (plain language generally is determinative).

Because I believe that it is not necessary to go beyond the statutory language and purpose in order to derive the statute's meaning, I need not address my colleagues' use of methods of analysis that are applicable under other circumstances. Nor need I address their rejection of the alternative argument advanced by Williamson. However, parts of the majority opinion merit comment, as does Williamson's contention.

Initially, I believe that my colleagues fail to recognize that the statute requires *only* that the "qualified use" be performed by *a* family member, and not that the family member who farms the land must be the *same* family member who inherited the property. The confusion is understandable, but I believe that the language of the statute is clear in this regard. Subsection (c)(1) states that the recapture tax is imposed when the qualified heir ceases to use the property for a qualified use, and subsection (c)(6)—which defines how subsection (c)(1) shall be construed—clearly states that the qualified heir continues to use the property for a qualified use as long as he owns the property and *a member of his family farms the land. See supra* at 1539 & n. 9. It is not, as the majority seems to believe, *Beryl's* use of the property (a "cash lease") that must constitute farming in order for the special use valuation established in § 2032A to apply; *as long as a member of his family actively farms* the property, Beryl's qualified use exemption does not terminate. Thus, the property is "qualified real property" under § 2032A(b) *not* because *Beryl* used it in a particular way, but because *Harvey* ("a member of [Elizabeth's] family") was using it as a farm (a "qualified use") at the time of Elizabeth's death and because *Harvey* ("a member of [Beryl's] family") continued to use it for that purpose after her death. Indeed, the focus is justifiably on Harvey's use, not Beryl's. That focus *makes sense:* as long as a statutorily-defined family member continues to farm the family-owned property (and ownership remains in the family), the rationale for the special valuation provisions (to keep the family farm economically viable) is applicable and the provisions of § 2032A apply.

The statutory language and structure are far more easily understood when read in light of the policies sought to be advanced by the special valuation provisions of § 2032A. Section 2032A is designed to assist the family farmer; in that statute, Congress recognized that small, family farms are often owned by an older family member and actively cultivated by the younger generation. These are the farms that § 2032A is designed to assist. When the older family member dies, the recapture tax provisions do not apply as long as the farm "stays in the family". The farm can "stay in the family"—even if the new owner is unable or unwilling to actually farm the land himself. In such case, the recapture tax can be avoided in one of three ways. First, the qualified heir can "materially participate" in the operation of the farm himself. *See* 26 U.S.C. § 2032A(c)(6)(B)(ii) (no recapture tax when the qualified heir materially participates in the operation of the farm); *see also infra* at 1540–41 (discussing crop-share lease as material participation). Second, the qualified heir can "keep the farm in the family" and avoid the recapture tax by disposing of the property to another family member; e.g., by giving or selling the property to a member of his family. *See* 26 U.S.C. § 2032A(e)(1) (disposal to family member makes recipient new "qualified heir"); *see also* 26 U.S.C. § 2032A(c)(1)(A) (explicitly exempting disposals "to a member of his

family" from the category of disposals that impose the recapture tax). Finally, he can retain ownership of the land but not materially participate in farming it himself *as long as a member of his family* actively farms the land and thereby "keeps the farm in the family". *See* 26 U.S.C. § 2032A(c)(6)(B)(ii) (no cessation of qualified use as long as a member of the family materially participates in the operation of the farm).

The statutory structure described above fulfills the policy rationale behind the enactment of § 2032A: to assist in the preservation of family farms. Here, Beryl has chosen the third route—leasing the land to a younger family member who actively farms it; the farm has remained wholly within the family and is being used as a family farm. The language, structure, and purpose of § 2032A make it clear that the recapture provisions do not apply in such circumstances. To hold, as the majority necessarily does, that a recapture tax would not accrue if Beryl *gave* or *sold* the land to Harvey, but that the tax applies because Beryl *leased* it to him instead, makes no sense, statutorily or otherwise, and is inconsistent with both the statutory language and purpose.

The majority's conclusion is driven by its concentration on the irrelevant circumstance that the lease between Beryl and Harvey is a "cash lease" rather than a "crop-share" lease. The distinction between these two forms of lease is relevant only when the lessee is an unrelated third party—not when he is a family member as defined in the statute. Section 2032A does *not* preclude special use valuation merely because the owner of the property does not actively farm the land and instead enters into a cash lease with a family member. There is no dispute that the Williamson's land would have been qualified real property subject to the special use valuation regardless of whether *Elizabeth's* lease with Harvey was a crop-share lease (as it actually was) or a cash lease (the form of lease into which Beryl and Harvey later entered). *See* 26 U.S.C. § 2032A(b)(1); 26 U.S.C. § 2032A(c)(6)(B)(ii); *Martin v. C.I.R.*, 783 F.2d 81, 84 (7th Cir.1986). The same is true with respect to the lease with Harvey entered into by Elizabeth's heir, Beryl.

Congress frowned on cash leases and subjected such agreements to a recapture tax only when the lease was with a *non-family member*. In such situations, the *owner* of the land, *the only family member involved,* becomes in fact a mere passive investor and hence is legitimately excluded from taking advantage of the special valuation provisions of § 2032A because there is *no* family member engaged in active farming. Here, however, Beryl's cash lease with Harvey is a cash lease with a *family member*. *See* 26 U.S.C. § 2032A(e)(2). Under a cash lease with a family member, a family member continues to actively participate in the farming activity. That is what Harvey did here. The fact that the active participant was Harvey (the family member) not Beryl (the heir) is immaterial for purposes of § 2032A, which specifically provides that cessation of qualified use occurs only when there is no material participation by the heir (or decedent) *or any member of his or her family. See supra* at 1539.

True, a crop-share lease (unlike a cash lease) would have avoided the recapture tax provisions even if the lease had been granted to an unrelated third party. That is because under a crop-share lease, "part of the risk of farming—remain[s] on the heirs rather than being totally shifted to the lessee." *Martin*, 783 F.2d at 84. An heir's retention of the risk under the terms of a crop-share lease qualifies as "material participation" in farming by the heir. *See id.* Thus, there is no "cessation of use" under subsection (c)(1)(B) in the case of a crop-share lease regardless of who the lessee is. However, as noted earlier, subsection (c)(6)(B)(ii) makes clear that material participation by the qualified heir (by way of crop-share lease or otherwise) is only one way to preclude imposition of the recapture tax. It is not necessary that the qualified heir *himself* materially participate in the operation of the farm so long as a *member of his family* so participates. Section 2032A does not require an heir who wishes to lease the farm he inherits to

enter into a *crop-share* lease and be subjected to the "risks" of farming himself—i.e., to assume the risks involved in leasing on a crop-share basis—he may, instead, lease the land to a member of his family under a cash lease as long as that family member actively farms the land. The reason that a cash lease to a family member does not terminate the "qualified use" is, of course, that the risk of any farming loss remains with a family member, the cash lessee. Only if the cash lease is with a non-family member, and thus the entire risk of farming is borne by a third party, does the qualified use terminate under the statute. Thus, while the majority correctly identifies the fact that Congress was concerned about cash leases and "passive" farming, it fails to recognize that Congress's concerns apply *only* when the cash lease is with a non-family member—only when the *family* that owns the family farm is engaged in passive farming, not just the heir.

The distinction between cash leases between *family members* and cash leases between *non-family members* is clearly demonstrated by each of the cases relied upon by the majority: each involved a lease with a non-family member. None, therefore, supports the majority's position that a lease *with a family member* subjects the property to a recapture tax; indeed, the language of the opinions relied upon by the majority suggests that, in direct opposition to the majority's view, the recapture tax is applicable *only* when the lease is *with a non-family member.* In *Martin v. C.I.R.*, 783 F.2d 81 (7th Cir.1986), the qualified heir entered into a cash lease with the highest bidder; in that case, a corporation, not a member of his family. *See id.* at 82. In *Schuneman v. United States*, 783 F.2d 694 (7th Cir.1986), the landowner entered into a cash lease with her neighbor, who was not related to her. *See id.* at 695–96. In *Brockman v. C.I.R.*, 903 F.2d 518 (7th Cir.1990), the landowner leased the property "to James Dickison, an unrelated neighbor". *Id.* at 520. In *Heffley v. C.I.R.*, 884 F.2d 279 (7th Cir.1989), there was no material participation in the farm by any member of the landowner's family. *See id.* at

282 (noting Tax Court finding that "neither [the owner] nor a member of her family had materially participated in operating the farm"); *id.* at 284 (holding that special use valuation is unavailable when "the farmland was leased on a fixed-price basis to an *outsider*") (emphasis added). And in *Estate of Sherrod v. Commissioner*, 774 F.2d 1057 (11th Cir.1985), *cert. denied*, 479 U.S. 814, 107 S.Ct. 66, 93 L.Ed.2d 24 (1986), the property was held not to be entitled to special use valuation because it was "rented to an *unrelated* party". *Id.* at 1059 (emphasis added); *see also id.* at 1064 (noting that lease was with "unrelated tenant" and "unrelated party"). These cases are therefore inapplicable here; indeed, by repeatedly mentioning the fact that the cash leases were with "unrelated" individuals, they substantially strengthen the view that what is relevant is not whether there is a cash lease, but whether the cash lease is with an unrelated party or a *family member*.

I believe that my colleagues' failure to recognize the distinction between cash leases with family members and cash leases with non-family members is created in part—perhaps understandably—by the incomplete legislative history that has accompanied the subsequent amendments to § 2032A. The majority persuasively identifies Congress' desire that a new owner who merely *rents* his farm on a cash lease basis to a *non-family member* (e.g., IBM or American Harvester) should not be permitted to take advantage of the special valuation provisions contained in § 2032A designed to protect the economic viability of the family farm. *See* Opinion at 1527–29. However, the legislative history isolated by my colleagues did not mention, did not intend to cover, and did not contemplate the situation presented here: a situation in which a decedent leased her property to a member of her family and that family member continued to farm the property under a cash lease with the new family member owner. When the *relevant* condition is isolated—the fact that the cash lease is to a *family member*—the proper resolution of this appeal becomes clear. *Com-*

pare Opinion at 1527 (" 'The mere passive rental of property will not qualify.' ") (quoting House Report) with 26 C.F.R. § 20.2032A–3(b)(1) ("The mere passive rental of property *to a party other than a member of the decedent's family* will not qualify.") (emphasis added). In any case, the legislative history does not answer the question raised in Williamson's appeal; in stark contrast, the plain language of § 2032A (and perhaps of the regulation) does. Thus, while my colleagues insist that "[i]f Congress intended to authorize a larger class of intra-family leases, it should have said so," Opinion at 1532, their focus on snippets of legislative history causes them to overlook the fact that Congress explicitly (although in a convoluted fashion) *did* say so in § 2032A.

I also believe that my colleagues mistakenly focus on the piecemeal amendment of the statute rather than its plain language as it exists now. The present case does not involve a cash lease from the decedent [Elizabeth] to a family member, *see* Opinion at 1528, or testamentary passage of the farm to the decedent's surviving spouse, *see* Opinion at 1529: the 1981 and 1988 Amendments are therefore largely irrelevant to this case. To the degree they *are* relevant, they support a finding *contrary* to the one made by my colleagues. For example, the 1981 amendment changed subsection (b)(1)'s requirement that the land, "on the date of the decedent's death, [ ] be[ ] used for a qualified use" so that subsection (b)(1) was satisfied as long as the land, "on the date of the decedent's death, [ ] be[ ] used for a qualified use *by*

the decedent or a member of the decedent's family." To me, that change reaffirm's Congress' intent that the special valuation provisions of § 2032A apply whenever *a family member*—not *just* the decedent or the new owner of the land—farms the land both prior and subsequent to the death of their landowning relative.[11]

Finally, while I believe that the proper result in this case is achieved by a close reading and analysis of the language of subsections (c)(1) and (c)(6), there may be an alternate statutory basis for that same result. Specifically, I am unpersuaded by the majority's answer to Beryl's contention that when he leased the property to Harvey, Harvey became the "qualified heir" pursuant to 26 U.S.C. § 2032A(e)(1) and hence that the recapture tax does not apply because he, the (new) qualified heir, continued to farm the land. Subsection (e)(1) states that "[i]f a qualified heir disposes of any interest in qualified real property to any member of his family, such member shall thereafter be treated as the qualified heir with respect to such interest." My colleagues insist that the term "disposes of any interest" means the *permanent* loss or renunciation of an interest and that a leasehold interest does not qualify. *See* Opinion at 1534–35. I find that answer unsatisfactory for three reasons. First, the statute explicitly refers to the release of *"any* interest" in the land: it is clear that a leasehold is *an* interest in the land,[12] and the plain language of subsection (e)(1) would thus seem to apply to the conveyance of both leasehold interests and more perma-

**11.** Nor does the proper interpretation of § 2032A "render the 1981 and 1988 amendments meaningless surplusage". The 1981 amendment would remain necessary to indicate that the qualified use is judged *either* by the use of the land by the decedent *or* a member of the decedent's family (not just the decedent). The 1988 amendment would remain necessary in situations where the land passes—unlike here—through the hands of a *surviving spouse after* the property was established as "qualified real property" on the basis of the use of the property by the *surviving spouse's husband* when he was alive. In addition, the 1988 amendment is necessary to ensure that the recapture tax is not imposed when property passes from a decedent to a surviving spouse and the surviving spouse

arranges for the land to be farmed by a member of *her* family who is not a family member of her spouse.

**12.** *See, e.g., Harbel Oil Company v. Steele,* 83 Ariz. 181, 318 P.2d 359, 361 (1957) ("A leasehold estate for a term of years is an interest in land capable of being transferred."); *Callahan v. Martin,* 3 Cal.2d 110, 118, 43 P.2d 788, 792 (1935) ("[A]n operating lessee under a lease for a term of years . . . has an interest or estate in real property. . . ."); *see also Williams v. Jones,* 326 So.2d 425, 433 (Fla.1975) ("[I]t is *well-established* that a valid lease for a term of years is a conveyance of an interest in land.") (emphasis added) (citation omitted).

nent interests in the land. Second, a lease for a term of years *permanently* renounces the owner's right to occupy the land for the lease period: because the owner has no right to enter the land as long as the lease is valid, the conveyance of a leasehold would seem to qualify even under the majority's restrictive interpretation of subsection (e)(1). Finally, my colleagues' belief that one cannot "dispose" of a leasehold interest is not only unsupported by precedent or authority, but is actually contradicted by such sources. *See Rider v. Cooney,* 94 Mont. 295, 23 P.2d 261, 263 (1933) ("[T]he leasing of the lands of the state for a term of years is the disposal of an interest or estate in the lands. . . ."). For those reasons, although I need not rely on the subsection (e)(1) argument, I find much to be said in its defense.[13]

Although I have numerous difficulties with my colleagues' resolution of Williamson's appeal, I recognize that there are two sides to the argument. The statute is complex and difficult to follow: the legislative history, far from simplifying matters, only makes things worse. It may well be that the result my colleagues reach is not, as a matter of statutory construction, an unreasonable one. However, based upon my reading of § 2032A, I believe that the language of the statute requires a contrary conclusion—and that the result I reach is more rational, more consistent with the statutory structure and purpose, and more just to family farmers. Clearly, Congress could not have intended the result the majority reaches here.

Accordingly, I respectfully dissent.

---

**13.** Parenthetically, I note that if Beryl's cash lease to Harvey "dispose[d] of any interest in qualified real property" under subsection (e)(1), that fact would not subject the property to a recapture tax under subsection (c)(1)(A), *see supra* at 1538, because that subsection explicitly excludes dispositions to family members. *See supra* at 1538 n. 6.